**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **ALLIED ORTHOPEDIC APPLICANCES, INC.,** on behalf of itself and all others similarly situated, | Master Case No. CV 05-06419 MRP (AJWx) Consolidated with: Case No. CV 05-06420 MRP (AJWx) Case No. CV 05-07492 MRP (AJWx) |
| Plaintiffs, | Case No. CV 05-08126 MRP (AJWx) Case No. CV 05-08254 MRP (AJWx) |
| v. | Case No. CV 06-00472 MRP (AJWx) |
| **TYCO HEALTHCARE GROUP L.P.,** a Delaware Partnership and | Case No. CV 06-00537 MRP (AJWx) |
| **MALLINCKRODT INCORPORATED,** a Delaware corporation | **ORDER: 1) DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; AND 2) DENYING** |
| Defendants. | **DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF JOHN C. BEYER, PH.D** |

**I.**

**INTRODUCTION**

In this putative antitrust class action, Plaintiffs[1] are direct purchasers of Defendants'[2] pulse oximetry sensors and cables, also called consumables.  Plaintiffs challenge three categories

---

[1] Plaintiffs include: Allied Orthopedic Appliances, Inc.; Natchitoches Parish Hospital Service District; Brooks Memorial Hospital, Inc.; North Bay General Hospital, Inc.; Abington Memorial Hospital; South Jersey Hospital Inc.; and Deborah Heart & Lung Center (collectively, "Plaintiffs").

[2] Defendants include: Tyco Healthcare Group, L.P., Tyco International Ltd., Tyco International (U.S.), Inc., and Mallinckrodt Inc. (collectively, "Defendants" or "Tyco").

1

1   of predatory conduct that they claim led every direct purchaser of Tyco consumables to pay

2   excessive prices in the class period: (1) "market-share discounts," through which purchasers can

3   access lower prices by committing to buy a specified percentage of their pulse oximetry needs

4   from Tyco; (2) "sole-source contracts," through which members of group purchasing

5   organizations ("GPOs") can obtain favorable pricing in return for the GPOs' agreement not to

6   contract with other vendors for the same class of product; and (3) the introduction of Tyco's

7   OxiMax product line.

8         Two motions are before the Court.  Plaintiffs seek to certify a class pursuant to Federal

9   Rule of Civil Procedure 23 that would include every purchaser of any quantity of pulse oximetry

10   consumables directly from Defendants at any time from November 12, 2003 to the present.[3]

11   Defendants also move under Rule 702 of the Federal Rules of Evidence ("Rule 702") and

12   *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993) to exclude the affidavit and

13   testimony of John C. Beyer, Ph.D ("Dr. Beyer"), Plaintiffs' sole economic expert in support of

14   class certification.  Having considered the briefs, relevant evidence, and the arguments of

15   counsel at the hearings, and having conducted the required rigorous examination of the facts and

16   law presented, the Court denies both motions on several grounds.

17         As to the Plaintiffs' motion for class certification, Plaintiffs have not met their burden of

18   showing they can prove "fact of injury" or "impact" on all class members through common

19   evidence; of showing that a recognized methodology exists for calculating damages on a class-

20   wide basis; of showing an absence of conflicts between members of the class enabling the

21   named representatives to adequately represent the interests of all absent members; or, of showing

22   their claims to be typical of the class.

23         Second, as to the Defendants' *Daubert* motion, there is no need to reach its merits at this

24   time.  Plaintiffs rely heavily on the opinions of Dr. Beyer in their effort to satisfy the

25   requirements of Rule 23, emphasizing that a lower *Daubert* standard applies to expert testimony

26

27   _____

28   [3] Pursuant to Plaintiffs' August 9, 2007 NOTICE OF PLAINTIFFS' PROPOSED AMENDMENT TO CLASS DEFINITION, Plaintiffs seek to advance the starting date for their would-be class period from August 29, 2001 to November 12, 2003.

1    at the class certification stage. *Dukes v. Wal-Mart, Inc.*, 474 F.3d 1214, 1227 (9th Cir. 2007).

2    The Court need not rule on the *admissibility* of Dr. Beyer's affidavit and testimony to assess,

3    factor by factor, "whether the expert evidence [he gives] is sufficiently probative to be useful in

4    evaluating whether [all] class certification requirements have been met." *Dukes v. Wal-Mart,*

5    *Inc.*, 222 F.R.D. 189, 191 (C.D. Cal. 2004), *aff'd* 474 F.3d 1214 (9th Cir. 2007).

6

7                                     **II.**

8                             **BACKGROUND**

9    **A.**      **The Pulse Oximetry Market**

10         Pulse oximetry involves non-invasive clinical procedures for monitoring the oxygenation

11    of patients' blood. The technology utilizes the red and infrared light absorption characteristics

12    of oxygenated versus deoxygenated hemoglobin. Oxygenated hemoglobin absorbs

13    comparatively more infrared-spectrum light than deoxygenated (or reduced) hemoglobin.

14    Conversely, deoxygenated hemoglobin absorbs comparatively more red-spectrum light than

15    oxygenated hemoglobin. Pulse oximetry *sensors* employ light-emitting diodes (LEDs) that

16    shine red- and infrared-spectrum light through a reasonably translucent site with good blood

17    flow. Typical adult/pediatric sites are the finger, toe, pinna (top) or lobe of the ear. Infant sites

18    are the foot or palm of the hand and the big toe or thumb. Opposite the emitter is a

19    photodetector that receives the light that passes through the measuring site. Based upon the ratio

20    of changing absorbance of the red and infrared light caused by the difference in color between

21    oxygen-bound (bright red) and oxygen unbound (dark red or blue, in severe cases) blood

22    hemoglobin, pulse oximetry *monitors* tethered via cabling to sensors calculate blood

23    oxygenation levels (i.e., the percent of hemoglobin molecules bound with oxygen molecules).

24         The pulse oximetry market is a systems market comprised of two product segments:

25    sensors and cables, also referred to as "consumables"; and (2) sockets (i.e., monitors/boards),

26    also referred to as "durables." Sockets and consumables are convoyed sales. *See, e.g.*, *Procter*

27    *& Gamble Co. v. Paragon Trade Brands, Inc.*, 989 F. Supp. 547, 610 (D. Del. 1997)

28    ("'Convoyed' or 'derivative' sales occur where the sale of one thing is likely to cause the sale of

1   another, such as selling a razor and then also being able to sell the blades to go with it."). A

2   broad range of sensors are available with different characteristics and prices depending on their

3   intended use in different patient populations and clinical settings. Sensors may be disposable,

4   reusable, or recycled; range in quality, validation, and look and feel; may be specialized for the

5   adult, pediatric, or infant and neonatal patient populations; and can allow measurements to be

6   taken from different parts of the body.

7           In contrast, sockets consistently represent a substantial initial expense. They may be

8   stand-alone monitors, which are marketed directly by manufacturers such as Tyco, as well as

9   multi-parameter monitors ("MPMs"), which are marketed by third-party original equipment

10  manufacturers ("OEM's"). Stand-alone monitors offered by particular manufacturers typically

11  mate with only a single type of sensor. A single socket can have a functional lifespan of

12  approximately five to seven years in clinical use, generating approximately five to seven years of

13  revenue from consumables associated with the socket. Socket/sensor incompatibility coupled

14  with the expense of prematurely replacing sockets has driven hospitals generally to prefer

15  standardization on a single brand.

16          Pulse oximeters were first sold in the United States in 1981. Tyco's predecessor entity,

17  Nellcor, entered the pulse oximetry market in 1983. Tyco's pulse oximetry technology was

18  initially protected by its "R-Cal" patent, by virtue of which Tyco successfully prevented

19  competitors from marketing pulse oximetry consumables compatible with Tyco sockets, or

20  sockets utilizing Tyco technology under license.[4] The R-Cal patent expired in November 2003.

21  Various generic sensor manufacturers have subsequently entered the market with Tyco-

22  compatible sensors: e.g., Dolphin Medical, GE Medical Systems, and Masimo Corporation.

23          Tyco's customer base for its pulse oximetry products has two categories: distributors and

24  end-users. Distributors constitute approximately fifty percent of Tyco's pulse oximetry

25  consumables market. They purchase from Tyco at list prices and resell to end-users at prices

26  negotiated and contracted for between the end-user and Tyco. The distributor commonly

27

28  ───────────────
    [4] In addition to manufacturing to its own products, Tyco licensed its oximetry technology to several OEMs,
    including GE Medical Systems, Philips, Spacelabs and Siemens.

4

receives reimbursement from Tyco for any difference between the list and contract prices, which is in addition to service fees charged by the distributor on a "cost-plus" basis. End-user customers consist of hospitals, who purchase equipment directly, and GPOs, who function as purchasing agents for groups of hospitals, investigating products, and aggregating their members' bargaining power to negotiate discounts.[5] Tyco entered agreements for the purchase of pulse oximetry products with many of the largest GPOs; Premier and Novation, for example, which have approximately 1,600 and 2,200 healthcare-entity members, respectively.

**B.    The *Masimo v. Tyco* Case**

Tyco's earlier market entry, R-Cal patent protection, and long-standing GPO contracts enabled Tyco to establish an installed base of oximetry sockets greatly exceeding its competitors. In May 2002, Masimo Corporation ("Masimo") -- Tyco's closest competitor -- filed an antitrust action against Tyco, which was tried to a jury in this Court. See *Masimo v. Tyco Healthcare Group, L.P.,* No. CV 02-04770 MRP, 2006 U.S. Dist. LEXIS 29977 (C.D. Cal. Mar. 22, 2006). Plaintiffs' Second Amended Consolidated Complaint (the "Complaint"), filed April 10, 2007, and the instant Motion For Class Certification expressly refer to that prior case. A brief history of the *Masimo* case illuminates Plaintiffs' theory of damages and argument in favor of certification.

In the early 1990's, Masimo developed an arguably superior pulse oximetry technology which it called "Masimo SET." Masimo SET rendered more highly accurate pulse oximetry readings under a wider variety of clinical applications than Tyco's technology permitted. It sold successfully in Europe in the early 1990s, and Masimo attempted to enter the U.S. market in 1998. But, despite its technological advantage and success abroad, Masimo's pulse oximetry products failed to achieve significant market penetration in the U.S. Masimo faulted Tyco's business practices, asserting violations of Section 3 of the Clayton Act ("Section 3"), 15 U.S.C. §§ 13, et seq., and Sections 1 and 2 of the Sherman Act ("Section 1" and "Section 2"), 15 U.S.C.

---

[5] Although GPOs negotiate sales contract terms on behalf of their members, it is the individual member hospitals themselves that directly purchase oximetry products.

5

§§ 1 and 2, against Tyco.  Masimo alleged that Tyco unlawfully maintained monopoly power in the market for pulse oximetry systems by exclusionary contracts violating Section 2 and constituting unreasonable restraints of trade and de facto exclusive dealing arrangements in violation of Section 1 and Section 3.

Masimo identified five Tyco business practices as anticompetitive under Sections 1 and 3: (1) "market-share discount" agreements, which promised favorable pricing to hospitals committing to purchase a specified percentage of their oximetry needs from Tyco; (2) "sole-source" GPO contracts, by which GPO member hospitals could obtain superior pricing by agreeing to purchase all of their oximetry needs from Tyco; (3) "bundled rebate" arrangements, which linked oximetry discounts to purchases of unrelated products; (4) OEM contracts that allegedly foreclosed OEMs from manufacturing monitors compatible with Masimo or other rival technology; and (5) oximetry "equipment finance programs," also known as Co-Op/OTIS, which repaid hospitals investments in sockets incrementally through sensor purchases.  According to Masimo, the combined effects of these allegedly anticompetitive practices blocked Masimo's entry into the U.S. market for pulse oximetry systems primarily through the mechanism of price.[6]  Masimo claimed that, for a hospital to purchase Masimo sensors, even if they were offered at a substantially lower price, the hospital would have to replace some or all of its existing Tyco compatible monitors.  However, Masimo claimed that, in most cases, it simply could not price its sensors low enough to compensate hospitals for both the replacement cost of

---

[6]  Masimo alleged that such practices further entrenched Tyco's installed base of pulse oximetry monitors and, because only Tyco sensors were compatible with Tyco monitors at that time, cemented Tyco's control over future revenue streams from consumables flowing from that base.  According to Masimo, this prevented Masimo from selling oximetry products to hospitals belonging to GPOs in contractual relationships with Tyco, restrained hospitals not so encumbered from switching to rival oximetry monitors prior to the expiration of their financing agreements, and, collectively, excluded Masimo's from the pulse oximetry systems market.

On Masimo's theory, Tyco's aggressive discounts enticed customers to enter into anticompetitive contracts that ensured Tyco's ongoing position as supplier of their oximetry needs.  For example, under a typical market-share discount agreement, a hospital could receive a 40% discount on sensors if it agreed to purchase at least 90% of its oximetry requirements from Tyco.  If hospital ultimately bought less than 90%, however, its discounts would be substantially reduced and the hospital might be precluded from receiving future discounts.  Similarly, if a hospital purchased all of its pulse oximetry equipment from Tyco pursuant to a sole-source agreement between Tyco and that hospital's GPO, the potential discounts could be even greater, but, there, too, penalties could potentially be applied if the hospital purchased any products from a Tyco competitor.

1    Tyco monitors and the loss of Tyco discounts.

2         In February and March of 2005, the Court held a jury trial.  As a result, the jury found

3    that Tyco's equipment finance programs were lawful, but that the remaining four practices

4    challenged by Masimo were violations of the antitrust laws, and awarded Masimo damages.  The

5    jury also found that all of Masimo's damages occurred between April 1, 1998 and July 1, 2001.

6         Following the trial, each party filed post-trial motions, and on March 22, 2006, the Court

7    issued a Memorandum of Decision Re: Post-Trial Motions (the "JMOL Order").  In the JMOL

8    Order, the Court sustained the jury's Section 1, 2 and 3 liability verdict based on the

9    anticompetitive effects of the market-share discount and sole-source GPO contracts, but vacated

10   the jury's finding of liability based on all other alleged anticompetitive practices.  The Court

11   further vacated the jury's damage award as not lying within the range sustainable by the proof

12   presented at trial, but gave effect to the finding of fact that all of Masimo's damages occurred

13   before July 2001.  The Court also granted a motion for a new trial on damages as to the market-

14   share discount agreements and sole-source GPO contracts for the pre-July 2001 damages period.

15        Pursuant to the parties' request, the Court held a bench trial on October 18 and 19, 2006

16   and issued a Memorandum of Decision on June 6, 2007 awarding Masimo damages for the

17   period April 1, 1998 to July 1, 2001, which amount was trebled pursuant to Section 4 of the

18   Clayton Act.  In that Memorandum, the Court identified and reiterated the proof supporting the

19   jury's finding that all of Masimo's damages occurred prior to July 1, 2001.  Specifically, the

20   Court pointed to testimony given by Masimo's principal witnesses that revealed a dramatic

21   change in the competitive landscape starting in July 2001.  Joe Kiani, Masimo's CEO and

22   founder testified that, after July, 2001, Masimo "never lost a sale."  Masimo's Radical product

23   allowed it to convert Tyco monitors to monitors compatible with Masimo sensors by employing

24   a simple cable.  Masimo's SatShare capability combined with the Radical Pulse Oximeter to

25   convert the pulse oximetry in a multi-parameter unit to Masimo SET pulse oximetry.  Finally,

26   Masimo began to make Tyco's multi-parameter units Masimo-compatible simply by swapping

27   an inexpensive Masimo oximetry board for the original Tyco board.  In conjunction with

28   Masimo's expanded roster of OEM partners and the subsequent expiration of Tyco's R-Cal

7

1    patent, the trial evidence suggested that Masimo's successful application of these strategies led

2    to substantial competitive gains over Tyco -- including securing contracts with several key GPOs

3    between 2001 and 2003.  The Court found that the potential after July 2001 for some or all of

4    these measures to bypass or displace a competitor's installed base of sockets adequately

5    supported the jury's allocation of all Masimo's damages to the period before July 1, 2001.

6

7    **C.      Plaintiffs' Class Action Suit**

8           1.      <u>The Original Consolidated Complaint</u>

9           The theory of this putative class action case, as articulated now by Plaintiffs, bears little

10   resemblance to Plaintiffs' original consolidated Complaint.  Originally, Plaintiffs had sought to

11   pick up where the *Masimo* case left off.  Focusing exclusively on the four business practices at

12   issue in *Masimo*, they claimed that Tyco's conduct had delayed Masimo's and other brand-name

13   competitors' entry into the pulse oximetry systems market, resulting in higher prices to direct

14   purchasers of pulse oximetry *systems*.   At a scheduling conference held on March 2, 2006,

15   Plaintiffs' counsel summarized the substance of this first iteration of their case as follows:

16           Our theory of the case is that the conduct that was tried before Your Honor . . .

17           [i]n *Masimo* . . . [t]hat led to the jury's finding that Tyco violated both Section 2

18           and Section 1 of the Sherman acts in delaying and foreclosing competitors in

19           entering into the pulse oximetry systems market is essentially the underpinning of

20           our case as well; that, you know, we allege, essentially, and contend, that the

21           same conduct that gave rise to liability with respect to Masimo will also give rise

22           with respect to liability to our clients . . . .   We contend that notwithstanding the

23           discounts that Tyco offered to its various purchasers, but for their conduct, had

24           Masimo been permitted free entry into the market, had other potential

25           competitors had access to the market, the price they paid for pulse oximetry

26           products would have been less even accounting for the discounts that they

27           received.  So that, on balance, we will show to the Court – we intend to show to

28           the Court that with respect to our class members, they were still overcharged for

their pulse oximetry product purchases.  And there are two aspects to our damage claim.  Number one, had Masimo gotten into the market sooner, been able to realize the economies of scale in an unfettered market, purchasers would have had the option of purchasing Masimo products, which would have been priced below Tyco's products.  And also we allege that as a result of competition, Tyco itself would have been forced to lower its prices to a competitive level.

March 2, 2006 Scheduling Conference Tr. at 8:22-11:13.

At that time, Plaintiffs intended to rely heavily on the *Masimo* case, and expressed their intention to use the doctrine of collateral estoppel to establish several factual issues, including "the appropriate relevant product in geographic markets, the extent of Tyco's conduct, and [whether it was] violative of Section 2 [and] Section 1 of the Sherman Act [and] the various components or types of conduct that gave rise to the liability – the bundling contracts, the exclusive dealing contracts, [and] the co-marketing agreements with O.E.M.s."  *Id.* at 16:22-17:7.

### 2.   The July 16, 2007 Hearing

By the time of the July 16 hearing on the instant motion, however, Plaintiffs had amended their complaint and shifted the theory of their case.  Plaintiffs' counsel no longer included a distributor plaintiff in the case.  Rather, their Named Plaintiffs were seven hospitals which directly purchased Tyco pulse oximetry equipment in the U.S. from August 29, 2001 to the present.  The product for which these hospital plaintiffs had allegedly overpaid also had changed: Plaintiffs now sought damages under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover overcharges that they – and all members of their proposed class – allegedly paid on pulse oximetry *consumables* – not systems.  Moreover, having had some discovery, Plaintiffs had changed their view on how Tyco had allegedly violated Sections 1 and 2 of the Sherman Act.

They had abandoned their challenge to Tyco's bundling and co-marketing agreements, devoted only minimal attention to Tyco's market-share and sole-source contracts, which were all

that remained of the jury's verdict in *Masimo*, and begun to focus instead on Tyco's so-called "OxiMax" strategy.   OxiMax refers to Tyco's successor to the R-Cal-based line of pulse oximetry monitors and associated consumables.   Plaintiffs' new "OxiMax" theory held that, starting no later than 1997, but launching officially in March 2002, Tyco executed a lock-out strategy calculated to avert or deflect generic competition that it anticipated would emerge following the expiration of its R-Cal patent.   Plaintiffs alleged that this strategy called for Tyco to convert substantial numbers of hospitals from its existing R-Cal monitors, which were compatible with generic sensors, to Tyco's new OxiMax line of monitors, which were designed with proprietary technology not compatible with generics.   Plaintiffs further alleged (1) that Tyco possessed monopoly power during the proposed class period; (2) that Tyco's OxiMax technology carried "little, if any, improvement or innovation" vis-à-vis its generic-friendly R-Cal technology (Pls.' Jan. 23, 2007 Motion, at 5); (3) that Tyco's introduction of OxiMax in advance of the expiration of the R-Cal patent discouraged adoption of generic rivals' Tyco-compatible sensors; and (4) that a monopolist who makes insignificant product design changes harmful to competition violates the antitrust laws.   Accordingly, Plaintiffs' proposed class comprised the following:

> All persons and entities who purchased pulse oximetry sensors and/or cables in the United States direct from Tyco at any time during the period August 29, 2001 through the present (and continuing until Tyco ceases its anticompetitive conduct, and the effects of that conduct cease) (the "Class Period").   The Class excludes Defendants, Defendants' parents, subsidiaries and affiliates and coconspirators, as well as federal government entities.

Pls.' Jan. 23, 2007 Motion, at 2-3.   This definition captured every entity purchasing any quantity of pulse oximetry consumables directly from Tyco at any time between August 29, 2001 and the present.

3.     Plaintiffs' Problematic Reliance On *Masimo*

Although Plaintiffs' theory had changed, their heavy reliance on the outcome of *Masimo*

had not.  At the July 16 hearing, both the Court and counsel for Tyco highlighted marked differences between *Masimo* and the instant case which undermine the legitimacy of such reliance.  First, the two cases address different product markets.  Where *Masimo* dealt with the U.S. market for pulse oximetry *systems*, including both monitors and sensors, the current case had, by this point, begun to focus solely on the market for Tyco-compatible *sensors*.  Although the two product segments are related due to the convoyed sales between monitors and sensors, they differ in terms of their lifecycles, product characteristics, market participants, their sales, pricing and distribution structures, and, in the case of generic versus brand-name sensors, their barriers to entry.  For example, prior to its expiration in November 2003, Tyco's R-Cal patent protected it against for Tyco-compatible sensors from generic manufacturers such as Dolphin, GE, or, to a far lesser extent, Masimo.

Second, the characteristics of the market for pulse oximetry systems, the market for Tyco-compatible pulse oximetry sensors, and the interaction between the two changed significantly over time.  Tyco initially dominated both product segments.  Masimo's entry into the former market in 1998 altered its competitive dynamic, and according to the *Masimo* jury, a tipping point in that dynamic was reached in the summer of 2001.  The jury found that Masimo suffered no injury from Tyco's anticompetitive conduct after July 2001; by that date Masimo had acquired sufficient market access to compete effectively.  Similarly, the expiration of Tyco's R-Cal patent in 2003 affected the market for Tyco-compatible sensors.  Generic rivals were no longer legally foreclosed, and they began manufacturing and marketing sensors for Tyco monitors.

Third, the damages period in *Masimo* ran from April 1998 to July 2001.  In contrast, Plaintiffs initially represented to this Court that they suffered ascertainable damages from August 29, 2001 to the present.  This is significant because Masimo had argued that the monopolistic effect of Tyco's market-share discount and sole-source contracts extended from 1998 to the present.  But, again, the jury found that those practices ceased injuring Masimo as of July 1, 2001.

Finally, Plaintiffs apparently intended to rely on the jury's determination that Tyco's

market-share discount and sole-source GPO contracts were anticompetitive as to Masimo between April 1998 to July 2001 to prove (1) that these agreements were anticompetitive as to generic rivals from August 29, 2001 to the present; and (2) that Tyco's pricing on pulse oximetry sensors over the same period was supracompetitive as a result.  Yet, the theory in *Masimo* was that Tyco violated the Sherman Act by, in essence, lowering its prices to a level – although still above cost – that Masimo could not match, at least initially.  In addition, then, to different markets, different market participants allegedly harmed, and different timeframes during which the harm allegedly occurred in this case, there is also a different mechanism of harm at work: i.e., over- rather than lowered-pricing.

### 4.    Plaintiffs' Proposed Amendment To Class Definition

Following the July 16 hearing, Plaintiffs' changed their theory yet again in a NOTICE OF PLAINTIFFS' PROPOSED AMENDMENT TO CLASS DEFINITION ("Pls. Cl. Am."), dated August 9, 2007, and their DECLARATION OF JOHN C. BEYER PH.D RE DAMAGES PERIOD ("Beyer Decl."), also dated August 9th.  Until that time, Plaintiffs had relied on the affidavit of Dr. Beyer to support class certification, and he appeared to be Plaintiffs' sole economic expert responsible for broadly analyzing the markets for pulse oximetry products.[7]  However, Plaintiffs' August 10, 2007 filings clarify that Dr. Beyer was retained exclusively to address damages: i.e., "to determine whether there was a common impact on class members from the alleged anticompetitive behavior of Tyco, that is, whether class members sustained injury, and, if so, [the magnitude] of the overcharges paid by class members and corresponding damages."[8]

---

[7] Dr. Beyer states on page 3 of his Affidavit that Plaintiffs asked him "to determine whether information common to all members of the proposed class can be used to examine and determine:  A. The relevant market or markets in this matter, B. Tyco's power in the relevant market or markets, and C. Whether and the extent to which Tyco exercised its power in the relevant market or markets to exclude, and/or forestall competition in the relevant market or markets."  He also states that Plaintiffs asked him "to determine whether information common to members of the proposed Plaintiff Class can be used to determine the impact of Tyco's alleged anticompetitive conduct related to pulse oximetry sensors and cables…[or] whether common evidence exists to show that all or virtually all members of the proposed Class paid higher prices for pulse oximetry sensors and cables than they would have paid absent the alleged anti-competitive conduct."

[8] It is now apparent that Plaintiffs have retained Professor H.E. Frech III broadly to "analyze the markets for pulse oximetry products," and specifically, "whether [Tyco] possessed market power in the sale of pulse oximetry

12

1    Damages Report of John C. Beyer, Ph.D. at 3.  Dr. Beyer stated in his August 9 Declaration that
2    Plaintiffs "hav[e] no objective basis for attributing to Masimo's success the decline in Nellcor
3    sensor prices during the pre-patent-expiration period of the class period, and [there is] some
4    evidence that sales of Masimo's proprietary technology were unaffected by Tyco's alleged
5    anticompetitive behavior after 2001."  Beyer Decl. at 1.  Whatever the meaning of this statement
6    may be, Dr. Beyer informed the Court that "an estimate of damages for the period August 29,
7    2001 through November 11, 2003" could not be provided.  *Id.* at 2.  Accordingly, Plaintiffs
8    revised the proposed class definition as follows:

9            All persons and entities who purchased pulse oximetry sensors and/or cables in
10           the United States direct from Tyco at any time during the period November 12,
11           2003 through the present (and continuing until Tyco ceases its anticompetitive
12           conduct, and the effects of that conduct cease) (the "Class Period").  The Class
13           excludes  Defendants,  Defendants'  parents,  subsidiaries  and  affiliates  and
14           coconspirators, as well as federal government entities.

15   Pls.' New Class Cert. Memorandum ("Pls. Mot."), at 1.  This revised definition would cover
16   every entity purchasing any quantity of any type of pulse oximetry consumables directly from
17   Tyco at any time between November 12, 2003 and the present.[9]

18           Under this revised definition, Plaintiffs reset the start date of their class period to a time
19   after the expiration of the R-Cal patent.  The theory of the case has thus shifted away from
20   Tyco's affect on Masimo's ability to compete in the market for brand-name pulse oximetry
21   systems, and toward Tyco's alleged foreclosure of competition from generic Tyco-compatible
22   sensor manufacturers post patent expiration.  The three Tyco practices that Plaintiffs' blame for

23

---

24   monitors, sensors and cables during the period 2001 to present," and if it did, "whether Tyco used anticompetitive
     means to acquire and/or maintain its market power," and finally, whether "Tyco's allegedly anticompetitive conduct
25   [had an effect] on prices paid by direct purchasers of Tyco's pulse oximetry sensors and cables."  Expert Report Of
     Professor H.E. Frech III at 2.
26   [9] The Ninth Circuit recently held that a district court may not strike allegations from an amended complaint that
     contradict an earlier iteration of the same pleading because doing so "effectively resolved those allegations on the
27   merits."  *Pae Government Services, Inc., v. MPRI*, No. 06-56438-RGK, 2007 U.S. App. LEXIS 29221 (9th Cir. Dec.
     18, 2007).  In this case, the Court does not take any position on the merits of the current antitrust theory of harm
28   advanced by the Plaintiffs in light of the previous iterations, but offers the full procedural history of this action to
     demonstrate fully how the proposed class definition was reached.

13

1  foreclosing generic sensor manufactures from the market remain the same: (1) market-share

2  discounts; (2) sole-source contracts; and (3) the introduction of Tyco's OxiMax product line.

### III.

### LEGAL STANDARDS

The Court assumes familiarity with Rule 23, and a brief review of the relevant standards will suffice.  Under Rule 23(a), the Court may certify a class only if: "(1) the class is so numerous that joinder of all members is impracticable (2) there are questions of law or fact common to the class (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P.  23(a).

In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that their action is maintainable under Rule 23(b)(1), (2), or (3).  Where, as here, plaintiffs seek to qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites:  Common questions must "predominate over any questions affecting only individual members"; and class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy."  *Amchem Prods. Inc. v. George Windsor,* 521 U.S. 591, 615 (1997).  "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy."  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir 2001) (citing *Valentino v. Carter-Wallace. Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996)).

The party seeking certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met.  *See Zinser*, 253 F.3d at 1186.

### IV.

### ANALYSIS

The Court, in its role as fiduciary for the absent potential class members, conducted an

14

1  independent and "rigorous analysis" of Plaintiffs' claims to examine whether the requirements of

2  Rule 23 are met.  *See General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982).

3  The Court concludes that they are not.  Plaintiffs have failed to show sufficiently (1) that

4  common questions predominate, as "fact of injury" and "damages" cannot be proven with

5  common evidence; (2) that Plaintiffs are adequate representatives of the class (e.g. that conflicts

6  between members of the proposed class are absent); and (3) that Plaintiffs' claims are typical of

7  the class.[10]

8

9  **A.     Common Evidence to Show Class-Wide Impact**

10        To succeed in an antitrust action, a plaintiff must establish (1) an antitrust violation; (2)

11  "impact" or "fact of injury" (e.g. causation); and (3) the amount of damages.  *Continental*

12  *Orthopedic Appliances, Inc., v. Health Ins. Plan of Greater New York, Inc.,* 198 F.R.D. 41, 44

13  (E.D.N.Y. 2000).  In the class action context, class certification is precluded where plaintiffs

14  have not shown that the fact of injury element can be proven for all class members with common

15  evidence.  *See generally In re Live Concert Antitrust Litig.,* No. 06-ML-1745-SVW, 2007 U.S.

16  Dist. LEXIS 82894, at *129-132 (C.D. Cal. Oct. 22, 2007).  *See also Blades v. Monsanto Co.*,

17  400 F.3d 562, 575 (8th. Cir. 2005); *Kurihara v. Best Buy Co.*, No.  06-01884-MHP, 2007 U.S.

18  Dist. LEXIS 64224, at *25-26 (N.D. Cal. Aug. 30, 2007).

19        In this case, Plaintiffs must show that common, class-wide proof exists to show that all

20  purchasers of Tyco consumables paid more in the actual world than they would have in a "but-

21  for" world characterized by the absence of the three challenged practices for purchases made

22  during the class period of November 12, 2003 to the present.[11]

23

24  _____

[10] Tyco does not dispute the fact that the numerosity or commonality requirements of Rule 23(a) are met here.  The

25  Court concludes that Plaintiffs have adequately shown numerosity because the class is estimated to consitute 7,000 geographically dispersed members.  Plaintiffs have also met their burden to show commonality because common

26  questions exist as to whether (1) Tyco possessed monopoly power in the relevant markets and (2) Tyco maintained its monopoly through willful and anticompetitive activity.

27  [11] Tyco argues that Plaintiffs appear to be challenging other Tyco practices, namely the Co-Op and OTIS equipment financing programs.  Certainly Tyco is correct that Plaintiffs' experts provide opinions that those programs were

28  used to maximize OxiMax monitor penetration.  *See, e.g.*, Damages Report of John C. Beyer, Ph.D. ¶47.  Plaintiffs respond that they challenge these programs <u>only</u> insofar as they facilitated conversion to the OxiMax platform.  In

1

2          1.  Plaintiffs' Proof of Common Impact

3          Plaintiffs rely on the supporting affidavit, report, and testimony of Dr. Beyer to show

4    common evidence exists to show class-wide impact.  According to Dr. Beyer, in the but-for

5    world "the sensor market would have been completely different from the market that actually

6    prevailed."  Damages Report of John C. Beyer, Ph.D. ¶79.  In particular, generic manufacturers

7    would have achieved more pronounced penetration in the markets for pulse oximetry sensors.

8    *Id.* ¶80.

9          The price of these generics, according to Dr. Beyer, would have averaged $6,

10   substantially less than Tyco charged for its brand-name consumables.  Under his theory,

11   purchasers of R-Cal-compatible sensors are extremely price sensitive – in other words,

12   purchasers make purchasing decisions primarily on the basis of price because they view the

13   sensors as an undifferentiated, commodity-like product.  *Id.* ¶39-41.  With effective generic

14   competition and the lack of restraints posed by the OxiMax technology and the challenged

15   practices, then, Tyco would have been forced to lower R-Cal-compatible sensor prices to the

16   same prices that the generic firms were charging (e.g. $6), and compete on the basis of

17   advantages in manufacturing processes.  *Id.* ¶81.

18         Accordingly, a Tyco sensor purchaser was impacted if it paid more than $6 for its

19   sensors.  *Id.* ¶85.  Plaintiffs and Dr. Beyer conclude that common impact can be shown because

20   nearly all class members (ranging from 99.1% to 99.9%) paid more than $6 for Tyco sensors

21   over the course of the class period.  *Id.*

22

23         2.  Discussion

24         Plaintiffs' common impact theory suffers from serious flaws, no doubt in part due to their

25   heavy reliance on pre-R-Cal patent expiration Tyco strategy documents to establish the but-for

26   world rather than meaningful market analysis, and due to their broad class definition (*all*

27

28   _____

     this view, but-for world purchasers of Tyco pulse oximetry products had available Co-Op and OTIS equipment
     financing programs.

                                    16

purchasers of *any* Tyco consumables).  The flaws are exacerbated by Plaintiffs' narrow focus on Tyco's purported "OxiMax strategy" despite their allegations of a broader array of anticompetitive conduct.  While their simplistic theory has superficial appeal, it does not adequately account for, evaluate, or even *consider*, the complexities in their theory and pulse oximetry sensor markets that have become evident over the course of this litigation and the *Masimo* case.  These complexities clearly suggest that injury cannot be shown on a class-wide basis for the very broad class the Plaintiffs seek to encompass.

Plaintiffs rely on *In re Cardizem CD Antitrust Litigation*, 200 F.R.D. 326, 348 (E.D. Mich. 2001), in stating that "courts have routinely rejected a defendant's attempt to characterize the market as too complex for common proof of injury or that variations in pricing preclude a showing of predominance."  Pls.' New Reply Memo., at 15 n.19.  *In re Cardizem* involved certification of a class of consumers and third-party health-care benefit providers who purchased a brand-name drug, and were harmed by the defendants' conspiracy and price-fixing agreement to delay the release of a cheaper, generic drug.  200 F.R.D. at 343.  Plaintiffs argue that the analysis of class certification in a monopolization case like this case is no different than a price-fixing conspiracy case such as *In re Cardizem*.

This case is easily distinguished from *In re Cardizem* and the distinctions are illustrative of some of the problems with Plaintiffs' theory of class-wide impact here.  There the court considered a price fixing agreement which was deemed a *per se* violation of the Sherman Act on summary judgment.  *In re Cardizem*, 200 F.R.D. at 332.  Such an illegal price fixing agreement that directly inflates prices is far more persuasive to show that injury can be proven on a class-wide basis, than an alleged "array of anti-competitive conduct having an <u>indirect effect</u> on, among other things, the general price level" of the products at issue.  *Continental Orthopedic Appliances,* 198 F.R.D. at 46 (emphasis added).  Accordingly, proof of fact of injury requires much more than a simple showing that the plaintiffs purchased an item in a world where average prices were inflated.[12]  *Id.*  Second, and significantly, in *In re Cardizem*, the court redefined the

---

[12] Even in conspiracy cases courts have cautioned against simply *presuming* class-wide impact on the basis of speculative expert testimony "without any consideration of whether the markets or the alleged conspiracy at

class to exclude "brand loyal" customers, and thus, only included in the class purchasers who *actually* switched to the generics.  200 F.R.D. at 343.  Only in doing so was the court satisfied that the need for individual proofs was eliminated – plaintiffs did *not* argue or proffer generalized evidence that the <u>prices of the brand name product</u> would have been lower (or explain how much lower they would have been) had generic competition proceeded without barrier. *Id.* at 343.  Here, Plaintiffs seek to do precisely that: they seek to include in the class <u>all purchasers</u> of Tyco products whether or not they switched, considered switching, or were able to switch to generic pulse oximetry sensors.  Were this Court to follow the *In re Cardizem* approach of narrowing the class to those clearly impacted by the lack of success of generic competition, the class would very likely be composed of a handful of plaintiffs, in light of the small market share that generic R-Cal sensors have captured since the expiration of the R-Cal patent.  *See* Damages Report of John C. Beyer, Ph.D. at Table 2 (Generic sensor sales accounting for 0.05%, 2%, 2.6%, 2.5%, 1.7% of total R-Cal sensor sales in 2003-2007 respectively).  Third, *In re Cardizem* dealt with a class of purchasers of a single drug, Cardizem CD, and its biologically equivalent generic substitutes.  In this case, Plaintiffs seek to encompass purchasers of dozens of types of Tyco pulse oximetry consumables, which range in list price from $9.50 to $275, without providing the Court any concrete proof of how generics would have affected Tyco across its whole product line in the but-for world.  Finally, the *In re Cardizem* Plaintiff offered well-reasoned expert analysis explaining the pricing that individual consumers received, for both generics and the brand name product, despite the purported complexity of the market. *Id.* at 342.  The expert's analysis was similarly comprehensive as to the substitutability of the generic drugs for the brand name drug. *Id.* at 344.  In this case, Dr. Beyer merely recites statements pulled from predictive internal Tyco documents without meaningful further investigation.  These distinctions make it quite clear that conclusions reached in cases such as *In re Cardizem* do not apply to the facts here.  The Court proceeds by examining the features of sales of pulse oximetry sensors and how they affect the modicum of "common evidence"

---

issue…actually operated in such a manner so as to justify that presumption." *Blades v. Monsanto Co.*, 400 F.3d at 568 (quoting district court).

1  Plaintiffs contend can show class-wide impact.

2

3          a.   Average Prices

4          The clear standard in the market involved here has long been to charge a range of prices

5  to different customers even for identical products.  *See* Reply Declaration of Janusz A. Ordover

6  In Support Of Defendants' Motion To Exclude The Testimony Of John C. Beyer And in Further

7  Opposition To Class Certification ("Ordover Decl."), at 9.  "[W]hatever the average price may

8  be, you have a range of prices, where some people pay several dollars more and some people

9  pay several dollars less."  First Class Cert. Hr'g. Tr. 59:5-9.  Dr. Beyer confirms this reality.

10 Table 2 of Dr. Beyer's affidavit presents the number of purchasers, as of December 1, 2003 and

11 March 1, 2006, respectively, who paid net prices for Nellcor Oxisensor II adult sensors at each

12 of twenty-two (22) distinct pricing levels.  The net price paid ranged from $7.80 to $15.00.  The

13 average price paid in 2003 was $10.71.  The average price paid in 2006 was $10.39.  In 2003,

14 thirty-five percent of purchasers (i.e., 503/1424) paid more than a dollar above the average price,

15 while forty-five percent (i.e., 637/1424) paid more than a dollar less.  Similarly, in 2006, twenty-

16 nine percent of purchasers (i.e., 265/902) paid more than a dollar above the average price, while

17 thirty-four percent (i.e., 306/902) paid more than a dollar less.

18

19          i.   Pricing of Generics

20         Tyco's pricing practices illustrate that sensor prices operate according to a widely

21 varying distribution, so the underlined average price for any particular sensor only furnishes part of the

22 picture.  The same appears to be true with generic firms in both the but-for and actual worlds.

23 Generics will not charge $6 for every sensor; rather, they too will charge prices that vary by

24 customer according to any number of factors, which may or may not relate at all to the factors

25 that affect Tyco pricing.[13]

26         Here, Plaintiffs and Dr. Beyer fail to examine the distribution of prices charged by

27

28 ──────────────────────
   [13] *See, e.g.,* Section IV.A.2.d, *infra.*

                                    19

1   generics either at a single point in time or over the course of the class period.  Nor do they

2   contend that generics charge the same price to all purchasers.  This gives the Court little basis to

3   conclude that the average price of generics sets some sort of evidentiary standard by which it

4   may be decided that all or virtually all purchasers of Tyco sensors were overcharged.  Some

5   purchasers may not have been able to pay less for generics compared to their Tyco purchases,

6   even if the <u>average</u> generic price of $6 represents a reduction in comparison to Tyco prices.

7   Also, because of the variability in generic pricing the Court cannot even speculate to what extent

8   generic pricing would have driven Tyco to lower its prices to any particular customers in the but-

9   for world.  Plaintiffs and Dr. Beyer do not discuss the distributions of generic sensor prices at

10  all.

11

12              ii.  Pricing of Tyco sensors

13              Even more problematic is Plaintiffs' failure to address the distribution of <u>Tyco</u> prices in

14  the but-for world.   Dr. Beyer and Plaintiffs do not, and probably cannot, show that <u>each and

15  every</u> Tyco Adult R-Cal disposable sensor purchaser would pay $6 in the but-for world.  *See*

16  Dusseault Decl. In Supp. Of Defendants' New Opp., Exh. Y at 143 (Beyer Depo. at 214:23-25).

17  Thus, the relevant question is what each purchaser paid in the actual world, relative to what that

18  purchaser would have paid in the but-for world.  The relevant question is <u>not</u> the question that

19  the Plaintiffs and Dr. Beyer repeatedly address: what each individual purchaser paid in the actual

20  world, relative to the <u>average price</u> of either generics or some Tyco sensors in the but-for

21  world.[14]

22

23  ────────────────────
    [14] Plaintiffs appear to believe that they can avoid the more complicated question because, "it defies economic logic
24  to assume that any but the most insignificant purchasers would have been better off in the actual world than the but-
    for world when the actual average price for Tyco's adult sensor ($10) was 67% more than the average but-for price
    [$6] and when no more than ten R-Cal purchasers paid less than $8.00 on average during any fiscal quarter during
25  the class period." Pls.' New Reply Memo., at 13-14.
              While the Court does not profess expertise in "economic logic," it observes that there was a not
26  insignificant number of purchasers at almost every price increment between $7.80 and $15 in the actual world in
    both 2003 and 2006.  *See* Dr. Beyer Aff. at Table 2.  If the same distribution is assumed in the but-for world with a
27  67% reduction in <u>average</u> price (i.e. $4 for each price point), then there would be a not insignificant number of
    purchasers at almost every price increment between $3.80 and $11.  Thus, a number of purchasers in the but-for
28  world (those paying between $7.80 and $11) could *still* be paying more than many purchasers did in the actual world
    despite the average price drop.  To be clear, the Court is not suggesting that maintaining the same absolute

1      It is possible that a $6 average price of generics would have forced Tyco to lower its

2  prices some amount across the board, and thus, each purchaser overpaid in the actual world.

3  However, to reach that conclusion, <u>even assuming</u> that Tyco's average price dropped as much as

4  $4,[15] one <u>must also assume</u> that Tyco would have dropped its price for each individual

5  purchaser.  Without that assumption, some purchasers may have been in the same position or

6  received a better deal in the actual world.[16]

7      As would be expected, some courts readily make that assumption if it is shown that the

8  "list" price that forms the starting point for individualized pricing negotiations was higher in the

9  actual world than it would have been in the but-for world.  *See, e.g., J.B.D.L. Corp. v. Wyeth-*

10  *Ayerst Labs., Inc.,* 225 F.R.D. 208, 217 (S.D. Ohio 2003) (finding that individual price

11  negotiations do not affect common impact analysis because the anticompetitive conduct likely

12  raised the base price on which any discounts were based); *In re Flat Glass Antitrust Litig.*, 191

13  F.R.D. 472, 486 (W.D. Pa. 1999) (stating that, insofar as a price-fixing conspiracy was alleged,

14  "even though some plaintiffs negotiated prices, if plaintiffs can establish that the base price from

15  which these negotiations occurred was inflated, this would establish at least the fact of damage,

16  even if the extent of the damage by each plaintiff varied").  Plaintiffs and Dr. Beyer appear to be

17  asking the Court to make a similar assumption here.  *See* Damages Report of John C. Beyer,

18  Ph.D. ¶21 (explaining that all prices are determined with a starting point of a uniform list price).

19      Here, however, Plaintiffs do not simply challenge a price-fixing agreement or a single

20  anticompetitive practice that directly impacts purchasers, situations where that assumption might

21  be reasonable because the conduct affects purchasers in the same way.  Rather, in this case,

22

---

23  distribution of prices is appropriate in the but-for world.  It simply observes that given Plaintiffs' poorly reasoned

24  and conclusory analyses, it seems impossible to conclude that only the most "insignificant" purchasers would be
better off in the actual world using "economic logic."  If the Plaintiffs purport to use the term "insignificant" to refer
to the volume of purchases or some other metric, they have not presented an adequate explanation to the Court.

25  [15] The conclusion that Tyco's average price would have dropped $4, so that it exactly matched the generics – in
other words, that Tyco could not charge *any* premium at all for its brand-name products - is also largely unsupported

26  by the Plaintiffs.  *See* Section IV.A.2.b, *infra*.  The very documents that Dr. Beyer relies upon to establish his $6
average generic price also suggest that Tyco would continue to charge a premium for its own brand-name products.

27  *See* Brody Decl., Exh. 4, at 62.  The larger the premium Tyco could have charged, the more purchasers that could
have been better off in the actual world.

28  [16] In the example set out in Note 14, *supra*, those purchasers who paid between $7.80 and $11 in the but-for world
may not have been harmed at all.

21

Plaintiffs allege an array of three different types of anticompetitive conduct, each with different direct and indirect effects on individual purchasers and competitors.  For example, in light of contentions and evidence of the *Masimo* trial  – in particular, that Tyco foreclosed Masimo by lowering prices with market-share and sole-source contracts – the Court would be remiss in simply assuming that every individual plaintiff would have paid less for Tyco products in the but-for world.  Market-share and sole-source contracts operate by giving hospitals discounts off list prices in return for their commitment to buy specified percentages of their sensor needs from Tyco.  Thus, even if the contracts foreclosed Tyco's generic competitors and resulted in a higher average sensor price in the actual world, many individual class members may have benefited from discounts and deals on Tyco products that would be unavailable to them in the but-for world.  In other words, any reduction in prices due to generic competition is potentially outweighed by the loss of contractual discounts off list prices.  The result is to shuffle the position of sensor purchasers in the but-for world in a manner that defies predictability with common evidence.

Accordingly, the more appropriate assumption under the facts of this case is that in the but-for world, some purchasers would have had available more favorable pricing, and others would not.  The precise price distribution is fundamentally unclear; the only conclusion that can be reached is that the distribution in the actual world probably does not reflect the distribution which would occur in the but-for world, even if the average price changed.  Plaintiffs and Dr. Beyer have avoided the issue entirely, providing the Court with no assessment of the but-for world apart from the average price of a certain type of generic sensor.  The Court has identified two scenarios where the issue comes into sharpest focus: (1) with small hospitals; and (2) with hospitals who require a diverse mix of pulse oximetry consumables.

### 1.   Small Hospitals

Tyco's disputed contracts permit small hospitals to obtain below-average pricing similar to that negotiated by large hospitals by virtue of their superior bargaining power and high volume orders.  Market-share and sole-source commitments would no longer equalize their

comparative disadvantage in purchase volume and bargaining power, and therefore although average prices would be lower, small hospitals would, in all likelihood, be forced to pay prices above that average in the but-for world.  Whether any such hospital was injured by higher average prices in the actual world turns on individualized evidence:  would the particular factors affecting the given hospital's bargaining power, in conjunction with any market-wide, downward pressure on price from enhanced generic competition, enable that hospital to negotiate pricing equal to or more favorable than that obtained under the challenged contracts? If not, Plaintiffs cannot show an overcharge as to that purchaser.  Plaintiffs and Dr. Beyer do not offer any argument or analysis purporting to show how the gains alleged to result from increased competition would offset, as to every small hospital, the value of the discounts lost.[17]  Nor do Plaintiffs invite the Court to remove beneficiaries of Tyco's market-share discounts and sole-source GPO contracts, or some other subset of Tyco purchasers, from the proposed class.  But without accounting or controlling for the benefits that many class members receive from the exclusionary conduct on a class-wide basis, the Court cannot conclude that Plaintiffs have shown that common evidence is available to show class-wide impact.

### 2. Hospitals with Mixed Sensor Requirements

Plaintiffs and Dr. Beyer also present no analysis of the mix of pulse oximetry consumables purchased by any members of the class, and this, too, is problematic for their average price theory.  Pulse oximetry consumables are a heterogeneous product: e.g., reusable sensors are more expensive than disposable sensors, and specialty sensors designed for particular patient populations or measurement locations on the body are more expensive than standard finger-tip sensors, or Tyco's lower priced disposable sensors.  The prices of sensor types vary substantially:  for example, OxiSensor II infant sensors averaged just under $13 in Quarter 1 of 2006, while the adult counterpart averaged under $10.  *See* Beyer Aff. at Figure 3.  Tyco

---

[17] Plaintiffs argue that "Tyco has presented no valid empirical evidence to counter Dr. Beyer's empirical analysis" that nearly every customer was overcharged.  *See* Pls.' New Reply Memo., at 14.  But it is Plaintiffs that have failed to meet their burden here by avoiding any meaningful analysis of Tyco's but-for prices in a world without OxiMax *and* without market-share and sole-source agreements.

1    products' list prices range from as low as $9.50 for the disposable OxiCliq sensors to as much as

2    $275 for the Durasensor Reusable Adult Finger Clip Sensor, *See* Ordover Decl. at Table 1, and

3    there are a substantial number of products listed at prices in the range of $10 and $275.  *Id.*  The

4    volume of sales of the various sensors vary substantially as well, with disposable R-Cal and

5    OxiMax sensors composing the bulk of Tyco's sales, and other specialty and recycled sensors

6    selling in smaller numbers.  Damages Report of John C. Beyer, Ph.D. at Exh. B, Table B-2a.

7            Important here, Plaintiffs do not show that a generic alternative would be offered with

8    every Tyco sensor type in the but-for world, or even most sensor types.  But where such

9    alternatives did not exist, the market as to that type of sensor could not be considered a

10   commodity market, and pricing for that sensor would not be expected to fall.  Thus, it is a

11   significant flaw that Dr. Beyer's damages report calculates a "but-for" price of every different

12   type of sensor by discounting those sensors the same amount (e.g. 40%) as he would the Adult

13   R-Cal disposable sensors.  *See* Damages Report of John C. Beyer, Ph.D. ¶91.  That discounting

14   almost certainly would *not* happen across the board, and not to the same degree across the board,

15   at least not unless generics would exist for all different types of sensors.

16           This is no doubt true when evaluated over time as well: some R-Cal sensors would have

17   had generic versions sooner than others, and the timing undoubtedly affects how Tyco would

18   have priced its products in the but-for world.  *See, e.g.,* Dusseault Decl. In Supp. Of Defendants'

19   New Opp., Exh. Y, at 153 (Beyer Depo. 284:17-21) (Dr. Beyer agrees that timing is relevant for

20   generic success).  Hospitals whose sensor requirements could not be satisfied by generics at a

21   particular point in time would have to pay Tyco's rates even in the but-for world.

22           As a result, some hospitals who received benefits from the disputed sole-source and

23   market-share discounts for all their Tyco pulse oximetry purchases could very well pay more in

24   a world where those discounts are unavailable, even though some types of the sensors – i.e. the

25   Adult R-Cal disposable sensor – are cheaper (or have a lower "list price") due to generic

26   penetration.  Thus, the question remains: how much would a particular mix of pulse oximetry

27   consumables purchased by a hospital, taking into account the market-share and sole-source

28   discounts, compare to the purchase of that mix of consumables in a world with enhanced generic

competition?

The Court cannot simply assume that the price would always be higher for purchasers with mixed sensor requirements, even if certain types of sensors make up the bulk of Tyco's sales.  *See* Damages Report of John C. Beyer, Ph.D. at Exh. B, Table B-2a.  Plaintiffs do not offer any analysis of the types and mixes of sensors purchased by Tyco's various class members and whether those particular mixes of sensors would have been less costly in the but-for world.  Nor do they examine the but-for availability of generics for other types of sensors besides adult R-Cal-compatible disposable sensors.  They fail to consider the views of purchasers with mixed sensor requirements, or that purchasers may be less inclined to buy generics for some, rather than other, sensors.  Finally, they fail to offer any realistic pricing characteristics – averages or distributions – for generic versions of the dozens of products in Tyco's catalog.  Thus, the Court concludes that knowing each individual hospital's historical purchases of and on-going preferences for sensors is essential to identifying impact to that particular hospital.  This precludes class certification for a class composed of purchasers of *all Tyco consumables* with the single piece of evidence that a particular type of sensor may have been offered in generic form at an average price of $6 in the "but-for" world.

### b.  Commodity Nature of the Products

Plaintiffs' argument for a class-wide overcharge depends heavily on Dr. Beyer's conclusion that pulse oximetry consumers regard R-Cal compatible sensors as a commodity product and, as a result, make purchasing decisions primarily based on price.  This is because, should consumers view Tyco-branded R-Cal and OxiMax sensors as *differentiated* from generic sensors, enhanced generic competition would not be expected to depress average prices of *Tyco* sensors nearly as much as Plaintiffs contend, if at all.  Rather, Tyco would continue to be free to charge price premia, notwithstanding the elimination of its market-share and sole-source incentive programs.  If that is the case, the $6 average price for generic sensors would be of even less relevance as evidence of Tyco pricing in the but-for world, and an even larger number of purchasers could have benefited from the anticompetitive conduct.  The "common evidence"

1   that underlies Dr. Beyer and Plaintiffs' theory of the commodity nature of R-Cal-compatible

2   sensors is simply insufficient to reach the conclusion urged by Plaintiffs, even for the limited

3   purpose of class certification.  At this time, it is certainly not clear that common evidence can

4   support this proposition.

5           In fact, there is persuasive evidence that Dr. Beyer is mistaken and this may <u>not</u> be a

6   commodity market, at least with respect to the entire class.  Market developments <u>since the</u>

7   <u>expiration of the R-Cal patent</u> (and <u>after</u> the Tyco documents were drafted) strongly imply that at

8   least some hospitals have developed non-price preferences in favor of Tyco-branded sensors,

9   notwithstanding their comparatively greater cost.  Several factors may explain these preferences:

10  (1) hospitals participating in Tyco's equipment financing programs retain financial interests –

11  namely, recouping investments in Tyco monitors – in continuing to purchase Tyco sensors; (2)

12  hospitals ascribe higher levels of product quality to Tyco-branded sensors[18]; (3) hospitals regard

13  Tyco as offering more desirable customer service or technical support[19]; (4) hospitals demand

14  particular mixes of specialty sensors for which no generic equivalents are produced – and prefer

15  to remain with a single vendor, like Tyco, rather than split their purchases across multiple

16  vendors; and (5), in the case of the OxiMax line, hospitals have found that OxiMax technology

17  offers clinical advantages over R-Cal-based systems.[20]

18          Perhaps the best evidence that consumers regard Tyco's sensors as differentiated from

19  their generic counterparts lies in the fact that generic firms have failed to capture significant

20  market share from Tyco since the R-Cal patent expired in November 2003.  Indeed, generic

21  firms' market share, ranging from 0.05% to 2.59% between 2003 and 2007 (with a maximum in

22  2005), Damages Report of John C. Beyer, Ph.D. at Table 2, are <u>very far</u> below the predictions of

23  Tyco in the pre-patent expiration documents (e.g. 7%, 13%, 19%, and 25% over the same time

24  period).  *See* Damages Report of John C. Beyer, Ph.D. ¶68.  Apparently purchasers of Tyco

25

26

---

[18] Some hospitals that began purchasing from generic manufacturers switched back to Tyco, citing product quality problems with generic sensors.  *See* Ordover Initial Decl. ¶ 59, fn. 65, Ex's. 55-58.

[19] Unlike its generic competitors, Tyco validates its sensors' performance on all R-Cal monitors.  *See* Ordover Initial Decl. ¶ 37.

[20] *See* Defendant's New Opp., at 8-9.

1  consumables generally have not switched to generics, even today, several years after the

2  expiration of the R-Cal patent.

3      Naturally, Plaintiffs and Dr. Beyer attribute the poor market penetration of generics to

4  the "success" of Tyco's exclusion through market-share discounts, sole-source GPO contracts,

5  and OxiMax line.[21]  *See, e.g,* Pls.' Mot., at 8 ("Tyco's OxiMax strategy was a greater success

6  than anticipated" because generics captured little market share, and had no constraining effects

7  on Tyco); Damages Report of John C. Beyer, Ph.D. ¶74 ("[t]he fact that there has been little

8  generic entry into the market after expiration of the R-Cal patents indicates to me that Tyco's

9  strategy…succeeded").   However, the fact remains that numerous vendors entered the market

10  and began freely selling generic R-Cal compatible consumables following the expiration of

11  Tyco's R-Cal patent.  *See* Ordover Decl. ¶ 20.  On the slight investigation conducted by Dr.

12  Beyer, *see* Damages Report of John C. Beyer, Ph.D. ¶¶75-77, it is, at best, no more likely that

13  generics failed to gain market share as predicted because of Tyco's exclusionary conduct than it

14  is that they were responding to consumer preferences for Tyco-brand sensors.  For example,

15  Named Plaintiff, Allied Orthopedic Appliances, Inc. ("Allied"), has admitted that "[t]here is no

16  reason why [it] can't purchase any oximeter."  Dusseault Decl., Ex. E at 39 (Greene Depo. at

17  73:3-4).  Similarly, Named Plaintiff, Abington Memorial Hospital ("Abington"), has admitted

18  that it was free to buy from Masimo or any other pulse oximetry vendor.  *See* Dusseault Decl.,

19  Ex. D at 26-27, 30-31 (Galati Depo. at 79:21-80:16, 148:21-149:6).  Named Plaintiff Deborah

20  Heart & Lung Center ("DH&LC"), meanwhile, never even considered generic vendors because

21  Tyco consumables "were a quality product that met [its] clinical needs."  Dusseault Decl., Ex. G

22  at 53 (Manni Depo. at 33:10-21).   Finally, Named Plaintiff Brooks Memorial Hospital

23  ("Brooks"), has acknowledged that it buys Tyco-branded consumables because it prefers the

24  discounts available through participation in Tyco's unchallenged bundling program.  *See*

25  Dusseault Decl., Ex. F at 46 (Ketcham Depo. at 45:3-18).  Thus, a majority of Plaintiffs' own

26  class representatives have admitted either to unencumbered discretion in their purchasing

27

28

---

[21] As might be expected, Dr. Beyer does not consider that Tyco's strategy documents were simply wrong.

1   decisions, a preference for lawful Tyco incentives over the competing alternatives, or

2   satisfaction with Tyco's products as priced sufficient to preempt, not only all demand for, but

3   also any curiosity about, rival options.

4       Plaintiffs write off this deficiency by arguing that "[t]he fact that some plaintiffs

5   continued to purchase Tyco's sensors even though generics may have been available is of no

6   consequence – even the most brand-loyal, price-insensitive Tyco customers are entitled to the

7   benefits of competition if unrestrained generic entry would have forced Tyco to lower its

8   prices." Pls.' Mot., at 17 (emphasis added).  But Plaintiffs miss the point.  The fact that there is

9   some evidence of brand-loyalty and price-insensitivity – indeed, more evidence of that than for

10  the undifferentiated nature of the products – tends to show that Tyco would not have been forced

11  to lower its prices across the board in the face of unrestrained generic entry.  *See, e.g., In re*

12  *Cardizem*, 200 F.R.D. at 342-343 (holding that individualized analysis necessary for brand-loyal

13  purchasers because it remained unclear they all suffered injury when generics were delayed).

14  Tyco may have maintained a substantial premia to all customers because of the brand-loyalty of

15  some.

16      It is neither appropriate nor necessary, and the Court expressly declines, to reach the

17  merits on the question of responsibility for the limited generic success.  Tyco may have out-

18  competed its generic rivals on the merits; or, alternatively, Tyco's challenged practices may have

19  unlawfully forestalled generic success; or, purchasers may not regard pulse oximetry

20  consumables as commodity products; or, alternatively again, Masimo's competitive successes

21  during the class period may have harmed generic growth.

22      The Court simply observes that Dr. Beyer has, in his analysis, "fail[ed] to address in

23  sufficient manner or degree [such] salient factors not attributable to the defendant's alleged

24  wrongdoing that may have caused the harm alleged," and this failure renders his conclusions

25  largely valueless.  *Lantec v. Novell, Inc.*, No. 95-CV-97-ST, 2001 U.S. Dist. LEXIS 24816, *19-

26  20 (D. Utah Feb. 13, 2001) (finding that Dr. Beyer's "failure to even mention or

27  analyze…alternative explanations, condemn his credibility").  *See also Blue Cross & Blue Shield*

28  *United v. Marshfield Clinic,* 152 F.3d 588, 593 (7th Cir. 1998) (Posner, J.) (finding Dr. Beyer's

1  simplistic analysis of antitrust damages "worthless" due to his failure to consider relevant factors

2  other than the anticompetitive conduct).  Here, Dr. Beyer cites one representative of Brooks

3  Memorial Hospital who explained that he knew nothing about generic firms nor had he ever

4  evaluated them because of his reliance on his group purchasing contract, Damages Report of

5  John C. Beyer, Ph.D. ¶78, and a pre-patent expiration Tyco survey about brand awareness, *Id*.

6  ¶77.  Dr. Beyer has not sufficiently interviewed purchasers of pulse oximetry products, generic

7  sensor manufacturers, or even employees of the seven named plaintiffs.  In the relevant time

8  frame, Dr. Beyer has shown no basis to believe that all customers choose vendors based on price

9  alone, sufficient to drive Tyco prices down to the level of generics, because, beyond any other

10  deficiency, he simply never asked.

11

12            c.  Tyco's predictions

13        As has become clear in the previous sections, Dr. Beyer's reliance on internal Tyco

14  documents created prior the R-Cal patent's expiration is both heavier and broader than either

15  their relevance or reliability can support.

16        For example, Dr. Beyer merely assumes rather than investigates the probative value of

17  the Tyco documents from which he draws significant conclusions.  In doing so, he unreasonably

18  takes predictions made with one set of assumptions and imports them into the but-for world,

19  where a dramatically different set of assumptions apply.  For example, a core assumption of the

20  OxiMax strategy documents is a substantial installed base of R-Cal monitors.  The large size of

21  that installed base is largely attributable to Tyco's market-share and sole-source contracts.  Yet,

22  in Plaintiffs' but-for world neither practice would exist.  At a minimum, effective competition

23  from Masimo that would have occurred absent those contracts would have eroded Tyco's

24  installed base.  Even more basic, any predictions made in those strategic documents appear to

25  presume the ongoing vitality of market-share and sole source agreements.  How the absence of

26  those agreements and the presumably more effective competition from Masimo would affect the

27  forecasts made in Tyco's strategy documents – or more broadly, pulse oximetry generic sensor

28  markets – is unclear.  Perhaps generics would have found entry into the R-Cal-compatible sensor

market less attractive in light of the smaller installed-base of sockets with R-Cal technology.  At this time, the Court cannot accept the forecasts, with no further economic analysis, as the primary basis for showing that every purchaser of Tyco consumables was overcharged.

In addition, Dr. Beyer mischaracterizes Tyco's $6 generic price prediction[22] in order to establish but-for world pricing.  Dr. Beyer claims that Tyco believed that average generic pricing would fall to $6 <u>unless</u> Tyco put its OxiMax strategy into action.  *See* Beyer Aff. ¶ 68.  However, the documents he cites as his source for this claim betray no such belief.  Rather, they predict generics will enter the market and depress prices <u>even if</u> Tyco launched OxiMax.  *See* Brody Decl., Exh. 12, at 171 ("The OxiMAX strategy <u>will not</u> prevent significant price erosion.  The OxiMAX model <u>assumes</u> the average price of adhesive sensors will fall substantially as a result of competitive pressure of generic R-Cal sensors.") (emphasis added).  That mischaracterization largely undermines the heavy reliance Dr. Beyer places on that figure to establish the characteristics of a world but-for the alleged "OxiMax strategy."

Finally, and in the same vein, Dr. Beyer cherry-picks from among Tyco's various forecasts the predictions and conclusions most consistent with and helpful to Plaintiffs' theory of the case, ignoring equally reliable predictions and conclusions found in the very same internal documents.  For example, Dr. Beyer relies on Tyco's "FY04 Plan" document to show that Tyco's "Best Heads" predicted a $6.00 floor on pricing for generic sensors; however, Dr. Beyer fails to address convictions on <u>the part of the same analysts expressed in the same report</u> that average pricing of Tyco's OxiMax sensor would stabilize at $10.50 in 2003, $9.50 in 2004, $9.00 in 2005, $8.50 in 2006, and $8.50 in 2007.  *See* Brody Decl. for Beyer Aff. II, Ex. 22 at 608.  He further ignores evidence, in those same documents, where Tyco predicts it may expect to charge price premia for other R-Cal sensors,  *See* Brody Decl., Exh. 4, at 62, an extremely relevant fact given the Plaintiffs' theory in this case, and one that seems to undermine the "average price" common impact argument.

---

[22] In his damages report, Dr. Beyer does present "actual market results" for generics, and finds average prices somewhat consistent with the Tyco documents, but the market shares entirely inconsistent.  But he does not utilize actual market results to reach his conclusions on the but-for world, and instead draws primarily from Tyco documents.

1

2          d.  Individualized Evidence

3          Without a viable methodology for establishing class-wide impact, determining the price

4   any hospital would have paid in the but-for world – a necessary step to show impact and injury –

5   will likely require highly individualized proof for several reasons:

6          First, a purchasing hospital's size, location and bargaining power each influence how

7   favorable a price it will be able to negotiate.   Volume-based discounts[23] offered to a large

8   hospital with hundreds of thousands of dollars in annual pulse oximetry purchases will not be

9   available to a small hospital with only several hundred dollars in annual requirements.

10  Accessibility to the sales representatives of competitors also impacts pricing; hospitals in larger

11  metropolitan areas are more likely to receive attention from the sale forces of rivals such as

12  Masimo, which they can leverage in negotiations with Tyco, than hospitals in small, rural areas.

13  Volume and the credible threat of losing a customer to a competitor both affect bargaining

14  power, but notwithstanding both, hospitals considered "thought leaders" – including teaching

15  (e.g., the Johns Hopkins Hospital) and prominent research (e.g., the Mark O. Hatfield Clinical

16  Research Center at the NIH) hospitals – will command superior pricing; after all, which

17  technology they select may drive the purchasing behavior of community hospitals, influence the

18  brand preferences of future doctors, and define the "gold standard" of care in pulse oximetry.

19         Second, as previously discussed in detail, the mix of pulse oximetry consumables

20  purchased by a hospital will affect the prices it pays.

21         Third, each purchasing hospital's access to and preference for Masimo's technology vis-

22  à-vis Tyco's R-Cal-based systems will influence the price it would pay for the latter in the but-

23  for world.   The *Masimo* jury concluded that, by the start of Plaintiffs' shortened class period,

24  Masimo was not foreclosed by Tyco's disputed share and sole-source contracts from competing

25  at *any* hospital, and, in fact, evidence from the *Masimo* trial reveals that Masimo was on contract

26

27  _____

28  [23] Quantity price differentials are generally permissible when limited to the sphere of actual cost differences or when required to meet competition, and their legality in this market is not disputed by the parties.  *See generally* Holmes, ANTITRUST LAW HANDBOOK § 4:4.

1   at several major GPOs during the proposed period.  It has been suggested that at least some

2   purchasers viewed Masimo's technology as differentiated from Tyco's products.[24]   Thus,

3   accurately establishing the prices *any* hospital would pay in the but-for world requires gauging

4   *every* hospital's mix of Masimo versus Tyco business.

5          Accordingly, the fourth factor affecting the prices hospitals are likely to pay in the but-

6   for world is GPO membership.  In addition to revealing and reflecting preexisting price

7   competition, GPO membership can indicate comparative differences in bargaining power.

8   Because, in essence, GPO's negotiate with manufacturers based upon volume, aggregating the

9   requirements of all of their institutional members, whether or not a hospital is a GPO member

10   will affect its negotiating position vis-à-vis Tyco – and, other things being equal, the favorability

11   of the pricing it is afforded.

12          Finally, it is necessary to consider which, if any, unchallenged Tyco discounting

13   practices each individual hospital-plaintiff either utilized in the actual world, or would have

14   utilized in the but-for world.[25]   The *Masimo* jury found Tyco's equipment-financing contracts to

15   be lawful.  In this case, Tyco's bundling and co-marketing programs have not been challenged as

16   unlawful.  These practices will continue to exist in the but-for world.

17

18          3.   Conclusion

19          In sum, Tyco's pricing in the but-for world will very likely require a detailed look into

20

21   [24] If customers viewed Masimo's technology as differentiated from Tyco's R-Cal-based systems, then the entrance

22   and wide availability of generic alternatives to R-Cal sensors would be expected to have, at best, only a limited
     effect on prices paid Masimo's proprietary sensors.  This is because, until prices for the generic equivalents to Tyco's
     R-Cal-based sensors are set (assuming no hospitals viewed Tyco's R-Cal sensors as differentiated from generics) or

23   succeed in driving prices of Tyco's brand-name R-Cal-based sensors (in this case, assuming the opposite) at or
     below the inflection point at which hospitals' preference for Masimo technology is outweighed by their preference

24   for superior pricing, Masimo would not be expected to match generic pricing.  Moreover, individual hospitals
     undoubtedly exhibit slightly different demand curves described their preferences for Masimo systems in relation to

25   the price of competing technology.  Thus, even if Masimo offered modest price decreases in the hopes of changing
     the location of the inflection point just mentioned, unless Plaintiffs show that generic pricing in the but-for world

26   would have been set so low as to trigger a shift in the preferences of *every* hospital away from Masimo, the necessity
     of individualized evidence would remain.

27
     [25] Because each GPO negotiates its own prices with Tyco on behalf of its members, including offering these

28   unchallenged programs under discussion, it would be equally essential to identify the specific GPO to which each
     GPO-member hospital belonged to control for the effect of those incentives on their but-for price.

the individual circumstances surrounding purchasers of Tyco pulse oximetry consumables.  The Court continues to take no position on the merits of whether any of the conduct at issue actually caused anticompetitive harm to individual class members.  However, the Court concludes that Plaintiffs have not shown a viable way that common evidence could prove antitrust injury to the class they seek to certify.  Accordingly, the predominance requirement of Rule 23(b)(3) has not been met.

## B.    Proof Of Damages

It has become routine for courts in antitrust class actions to rely on class-wide, aggregate techniques to calculate individual damage awards.  *See, e.g., In re Cardizem CD Antitrust Litigation*, 200 F.R.D. 297, 324 (E.D. Mich. 2001) (finding that the use of an aggregate approach to measure class-wide damages is appropriate).[26]  Where, as here, an antitrust action is brought on behalf of consumers alleging that a challenged activity artificially maintained prices above competitive levels, the plaintiffs may prove class-wide damages in the same manner as class-wide impact; by comparing prices during the period of challenged activity to prices as they would have been without the unlawful conduct, and arriving at a total damages figure for the class on the basis of the defendant's records of sales during the class period as to all members of the class.  *Id.*  However, proof of damages on a per-unit or average-transaction basis may not always be available – for example, when factors affecting pricing constantly vary in the industry involved.  *Id.*  Tyco argues that such variability is present in the pulse oximetry industry.  *See generally* Ordover Decl. ¶¶ 24-32.

Here, Plaintiffs' alleged overcharge varies in complex ways across Tyco's diverse customer base.  The same highly individualized factors affecting common impact complicate the

---

[26] *See also* 3 NEWBERG ON CLASS ACTIONS § 10:7 (4th ed.) ("damages in antitrust class actions may be determined on a class-wide, or aggregate basis, without resorting to fluid recovery where the computerized records of the particular industry, supplemented by claims forms, provide a means to distribute damages to injured class members in the amount of their respective damages"); 6 NEWBERG ON CLASS ACTIONS § 18:53 (4th ed.) ("[a]ntitrust class actions are particularly well suited to proof of total class damages, because damages in an antitrust suit need not be proved with common law precision . . . [and] . . . antitrust violations typically involve relatively small injuries to an extremely large number of people").

determination of Plaintiffs' actual, as well as but-for pricing.  This pricing complexity implies the need for individualized inquiry when estimating damages.  Applying mechanical formulae or statistical methods to individual class members' claims may alleviate that need.  *See In re Polypropylene Carpet Antitrust Litig.,* 996 F.Supp. 18, 29 (N.D. Ga. 1997) (finding aggregate proof of damages through econometric techniques is appropriate).[27]  But even if not, "individualized damage issues do not [necessarily] preclude a Rule 23(b)(3) class action when liability can be determined on a class-wide basis."  *See Schwab v. Philip Morris USA, Inc.*, 449 F.Supp.2d 992, 1119-1120 (E.D.N.Y. 2006).[28]  However, its relevance is contingent on being able to prove liability on a class-wide basis, *id.*  Because Plaintiffs have been unable to do so, Dr. Beyer must demonstrate a reliable mathematical or formulaic method for adequately calculating Plaintiffs' damages class-wide.

Plaintiffs describe a method of estimating class-wide damages that compares the actual prices paid for Tyco sensors with estimates of the but-for prices derived from Tyco's strategic documents.[29]  Pls.'. Mot., at 28-29.  But the very same flaws in the use of this information to show class-wide impact apply to its use for calculation of damages on a class-wide basis.  For

---

[27] *Cf.* 6 NEWBERG ON CLASS ACTIONS § 18:53 (4th ed.) ("the court should not reject a formula for determination of class-wide damages whenever feasible merely because it is complex or imprecise, where such a formula may be used to eliminate the need for individual proof of damages and thus serve the ends of both justice and judicial economy.")

[28] *See also In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124, 140 (2nd Cir. 2001) (citations omitted) ("[I]f defendants' argument (that the requirement of individualized proof on the question of damages is in itself sufficient to preclude class treatment) was uncritically accepted, there would be little if any place for the class action device in the adjudication of antitrust claims. Such a result should not be and has not been readily embraced by the various courts confronted with the same argument. The predominance requirement calls only for predominance, not exclusivity, of common questions."); *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 298 (5th Cir.2001) (affirming district court's determination that common issues predominated because "[a]lthough calculating damages will require some individualized determinations, it appears that virtually every issue prior to damages is a common issue"); *In re Potash*, 159 F.R.D. 682, 697 (D. Minn. 1995) ("the fact that the damages calculation may involve individualized analysis is not by itself sufficient to preclude certification [if] liability can be determined on a class-wide basis."); *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir.1975) ("The amount of damages is invariably an individual question and does not defeat class action treatment."). After all, as the *In re Visa* court observed, district courts retain numerous tools to manage individual damages issues that might arise at later stages of the litigation, including: (1) bifurcating liability and damage trials, (2) appointing a Special Master to preside over individual damages proceedings, (3) decertifying the class after the liability phase, (4) creating subclasses, or (5) altering the composition of the class.  *See In re Visa*, 280 F.3d at 141.

[29] The Court declines to address the "geographic benchmark" for estimation of damages, as Plaintiffs have not yet completed their analyses.  *See* Pls.' New Reply Memo., at 19 n.26.

example, the but-for prices will exist on a range that does will not identically relate to the range in the actual world due to the absence of market-share and sole-source contracts.  And the but-for prices will depend heavily on individual requirements for different types of sensors and preferences for generics.  Thus, with or without Tyco's forecasted prices of generics, calculating the but-for prices of Tyco consumables and the derivative damages suffered by any class member, are highly individualized inquiries.

The Ninth Circuit has urged caution regarding the use of "fluid recovery awards to circumvent individualized proof requirements."  *See Molski v. Gleich*, 318 F.3d 937, 954 (9th Cir. 2003) (citing *In re Hotel Tel. Charges*, 500 F.2d 86, 89-90 (9th Cir.1974), which held that "allowing gross damages by treating unsubstantiated claims of class members collectively significantly alters substantive rights under the antitrust statutes[ ]").  The greater the number of individualized issues not adequately captured by Dr. Beyer's methodology, the more difficult it will be for the court to manage the class action, and the greater the temptation for individual class members to litigate "numerous and substantial issues to establish [their] right to recover individually."  *Negrete v. Allianz Life Ins. Co. of North America*, 238 F.R.D. 482, 493 (C.D.Cal. 2006).  Accordingly, it is "simply not enough that Plaintiffs merely promise to develop in the future some unspecified workable damage formula.  A concrete, workable formula must be described before certification is granted."  *In re Medical Waste Services Antitrust Litigation*, No. 2:03MD1546 DAK, 2006 WL 538927, *8 (D. Utah March 3, 2006).[30]  Even at the class

---

[30] *Accord Lemon v. Harlem Globetrotters Intern., Inc.*, 437 F.Supp.2d 1089, 1104 (D. Ariz. 2006) ("Even in class actions, proof of damages must be presented plaintiff-by-plaintiff, and generalized, broad-brush damages arguments will not suffice."); *In re NCAA I-A Walk-On Football Players Litig.*, No. C04-1254C, 2006 WL 1207915 (W.D. Wash. May 3, 2006) (denying class certification motion because the plaintiffs' expert offered no method for determining each plaintiffs' "particular piece of the damages pie"); *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 87 (D. Mass. 2005) (denying class certification motion because "it is not permissible to use methods such as averaging damages to sweep individual issues under the judicial rug"); *Butt v. Allegheny Pepsi-Cola Bottling Co.*, 116 F.R.D. 486, 492 (E.D. Va. 1987) (denying class certification motion based on individual damages issues and stating: "Plaintiffs' expert states, in very general terms, that statistical methods exist by which individual damages may be calculated, and plaintiff asserts that a workable formula can be developed....The Court finds that plaintiff has failed to show that damages can be calculated other than through a detailed and individualized examination of hundreds of thousands of transactions."); *but see Negrete*, 238 F.R.D. at 493 ("in assessing whether to certify a class, the Court's inquiry is limited to whether or not the proposed methods for computing damages are so insubstantial as to amount to no method at all ... Plaintiffs need only come forward with plausible statistical or economic methodologies to demonstrate impact on a class-wide basis").

certification stage, more is required.  Dr. Beyer fails to conduct any meaningful economic analysis that could persuade the Court that the benchmark in Tyco's documents, or any other benchmark, could serve as a basis for a workable damage formula.  Therefore, Plaintiffs have not met their burden of showing that damages can be calculated on a class-wide basis.

**C.     Intra-Class Conflicts And Heterogeneity In The Potential Class**

      1.     Adequacy

Rule 23(a)(4) requires that the representative plaintiffs in class action adequately protect the interests of those absent class members they purport to represent.  Class certification will be inappropriate if fundamental conflicts of interest are determined to exist among the proposed class members.  *See* 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Proc. § 1768, at 326 (2d ed. 1986) ("It is axiomatic that a putative representative cannot adequately protect the class if his interests are antagonistic to or in conflict with the objectives of those he purports to represent.").  A conflict is "fundamental" when it goes to the specific issues in controversy, *id*. at 326-27, or where, as here, some plaintiffs claim to have been harmed by the same conduct that benefited other members of the class, preventing the named representatives from "vigorously prosecut[ing] the interests of the class through qualified counsel."  *Valley Drug Co. v. Geneva Pharmaceuticals, Inc*., 350 F.3d 1181, 1189 (11th Cir. 2003) (citing *In re HealthSouth Corp. Securities Litigation*, 213 F.R.D. 447, 461-63 (N.D. Ala. 2003)).  Their interests in such a case are actually or potentially antagonistic to, or in conflict with, the interests and objectives of other class members.  *Id*.; *see also Morris v. McCaddin*, 553 F.2d 866, 870-71 (4th Cir. 1977) (affirming district court's denial of class certification where "the interests of the named plaintiffs would have been antagonistic to the interests of many of the unnamed members of the class").

Thus, most courts share the view that "a class cannot be certified when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class."  *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) (reversing certification of a class of cattle producers where the class definition

included producers who claimed to have been harmed by contracts and marketing agreements that benefited some of the unnamed members of the class).[31]  In fact, to this Court's knowledge, no circuit approves of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class, let alone where some *named* plaintiffs derive such a benefit.  Because, as discussed with respect to impact, the substantial divergence in the way the elimination of market-share discounts and sole-source GPO contracts would affect small hospitals compared to large hospitals represents a fundamental conflict,[32] and because Plaintiffs and Dr. Beyer essentially ignore this problem, the named plaintiffs have not been shown to be adequate class representatives.[33]

### 2.   Typicality

Finally, Plaintiffs fail to meet the typicality requirement of Rule 23(a)(3).  Even as

---

[31] *See also Bieneman v. City of Chicago*, 864 F.2d 463, 465 (7th Cir. 1988) (ruling class certification would be inappropriate where the named representative purported to bring an action against the City of Chicago on behalf of all landowners in the vicinity of an airport, alleging that the City had harmed the class members by locating an airport in close proximity to their property by diminishing the value of the class members' property, but "[s]ome of these [class members] undoubtedly derive great benefit" from such proximity); *Phillips v. Klassen*, 502 F.2d 362, 366-67 (D.C. Cir. 1974) ("When as here, the action may be taken as conferring economic benefits or working economic harm, depending on the circumstances of the individual, the foundations of maintenance of a class action are undermined. In view of the likelihood that there will be divergent views among the employees who pursued the voluntary retirement route, as to whether they have been injured or benefited we cannot say the District Court erred in concluding that plaintiffs cannot fairly maintain the action they have brought in behalf of the more than 1,500 former employees."); *Auto Ventures, Inc. v. Moran*, 1997-1 Trade Cas. (CCH) ¶ 71,779, 1997 WL 306895 (S.D. Fla. 1997) (refusing to certify a class of Toyota dealers because "the class collapses into distinct groups of winners and losers").

[32] Importantly, this remains true even if Plaintiffs are correct that every direct purchaser of Tyco's pulse oximetry consumables suffered a degree of injury.  Every overcharged purchaser will have a similar interest in proving Tyco liable; however, small hospitals able to obtain top tier pricing only with Tyco's market-share or sole-source discounts would be better served by attributing the anticompetitive effect solely to Tyco's OxiMax line (so as to retain the benefits of the contractual discounts in the but-for world); large hospitals with a preference for cutting-edge technology and sufficient volume requirements and bargaining power to command top tier price without market-share or sole-source discounts would be better served by the opposite (so as to retain the clinical benefits of OxiMax sensors in the but-for world).

[33] The parties vigorously contest whether a conflict exists between distributor plaintiffs who "pass on" any overcharge, and end user purchaser plaintiffs who do not.  They also argue the extent to which Plaintiffs' class period revision creates a conflict.  Having found the existence of a conflict that precludes a finding of adequacy, the Court declines to reach these two questions.

between the seven named Plaintiffs there is sufficient heterogeneity to indicate that proof that one Plaintiff was overcharged is not probative of whether other class members were overcharged.  For example, Abington Memorial Hospital, a large hospital, *only* bought recycled Tyco consumables during the class period, was a member of the Novation GPO, and took advantage of market-share discounts.  The party indicated that it saved approximately $600,000 by purchasing recycled sensors rather than new ones from 2000 onwards.  Defendants' Notice of Lodging of Depo. Transcripts, Exh. A at 18 (Galati Depo. at 69:16-69-23).  Allied Orthopedic Appliances, in contrast, is a home medical equipment business that bought *only* 2 cases of sensors, amounting to some $700 in purchases over the class period, without any use of any challenged contracts or other unchallenged discounting.  Brooks Memorial Hospital is a small hospital that purchases Tyco and Masimo compatible monitors, and takes advantage of the unchallenged Tyco bundling program.  Deborah Heart & Lung Center, another small hospital, purchases all of its consumables from Tyco, takes advantage of market-share discounts, and purchases both through a "multi-source" GPO contract and by negotiating directly with Tyco.  Natchitoches is a small hospital that is a member of several GPOs and "cherry-picks" the best prices from the GPO contracts.  Thus, as between these seven named plaintiffs, it is apparent that Tyco's customers had significantly different purchasing volumes, preferred different sensor products, and operated under materially different contract terms.  It is far from evident that these seven named plaintiffs represent the full range of purchasers of Tyco pulse oximetry; indeed, not a single distributor serves as a named plaintiff despite the fact that distributors account for about half of these sales.

For example, proof that a large hospital, Abington, was overcharged for recycled sensors is simply not sufficiently probative of whether a small hospital, say, DH&LC, a recipient of market-share discounts, was also overcharged for a different type of sensor.  Similarly, that a customer without access to a GPO contract, say, Allied Orthopedic, was overcharged simply does not prove that a member of Novation (e.g., Brooks Memorial) or Amerinet (e.g., DH&LC) was also overcharged.  In other words, the variability in circumstances and interests of the putative class members invalidates the inference of typicality required by Rule 23 to certify

Plaintiffs' proposed class.

## V.

## CONCLUSION

For the foregoing reasons, Plaintiffs' MOTION FOR CLASS CERTIFICATION and DEFENDANT'S MOTION TO EXCLUDE THE TESTIMONY OF JOHN C. BEYER, PH.D are hereby DENIED.

IT IS SO ORDERED.

DATED: December 21, 2007

_____
Hon. Mariana R. Pfaelzer
United States District Judge

39