1
2
3
4
5
6
7
8           **UNITED STATES DISTRICT COURT**

9           **CENTRAL DISTRICT OF CALIFORNIA**

10

11    **ALLIED ORTHOPEDIC APPLICANCES,**        Master Case No. CV 05-06419 MRP (AJWx) √
      **INC.,** on behalf of itself and all others similarly
12    situated,
                                                 Consolidated with:
13                        Plaintiffs,            Case No. CV 05-06420 MRP (AJWx)
                                                 Case No. CV 05-07492 MRP (AJWx)
14            v.                                 Case No. CV 05-08126 MRP (AJWx)
                                                 Case No. CV 05-08254 MRP (AJWx)
15    **TYCO HEALTH CARE GROUP L.P.,** a         Case No. CV 06-00472 MRP (AJWx)
      Delaware Partnership and                   Case No. CV 06-00537 MRP (AJWx)
16    **MALLINCKRODT INCORPORATED,** a
      Delaware corporation                       **ORDER GRANTING**
17                                               **DEFENDANTS' MOTION FOR**
                                                 **SUMMARY JUDGMENT, OR IN**
18                        Defendants.            **THE ALTERNATIVE SUMMARY**
                                                 **ADJUDICATION OF CLAIMS**
19

20

21
              Plaintiffs[1] are six direct purchasers of Defendants'[2] pulse oximetry "consumable"
22
      products.  Plaintiffs' Second Amended Consolidated Complaint ("Complaint") alleges that Tyco
23
      violated Sections 1 and 2 of the Sherman Act ("Section 1" and "Section 2", respectively), 15
24

25

26    _____
      [1] Plaintiffs include Allied Orthopedic Appliances, Inc. ("Allied"), Natchitoches Parish Hospital Service District
27    ("Natchitoches"), Brooks Memorial Hospital, Inc. ("Brooks"), North Bay General Hospital, Inc. ("North Bay"),
      South Jersey Hospital Inc. ("South Jersey"), and Deborah Heart & Lung Center ("DHLC") (collectively,
      "Plaintiffs").  Abington Memorial Hospital ("Abington") was a Plaintiff in this case but was dismissed by stipulation
28    in May, 2008.
      [2] Defendants are Tyco Health Care Group L.P. and Mallinckrodt Inc. (collectively, "Tyco").

                                                 -1-

1  U.S.C. §§1 and 2, by engaging in three anticompetitive practices: (1) market-share agreements;

2  (2) sole-source agreements; and (3) the introduction of "OxiMax" technology.[3]  Plaintiffs seek,

3  amongst other things, damages for the artificially inflated prices that they paid on Tyco

4  consumables resulting from these practices.  Tyco now moves for summary judgment (or in the

5  alternative, summary adjudication of claims).  For the reasons discussed below, the Court

6  GRANTS Tyco's motion.

7

8  ## I.

9  ## BACKGROUND

10       The Court discusses the technology involved in this case and its procedural history in

11  depth in its Dec. 21, 2007 Class Certification Order.  *See* Order: 1) Denying Plaintiffs' Motion

12  for Class Certification; and 2) Denying Defendants' Motion to Exclude the Testimony of John C.

13  Beyer, Ph.D ("Class Certification Order").  That background is briefly reviewed here.

14

15  ### A.  Pulse Oximetry and Tyco's Business

16       Pulse oximetry provides a non-invasive method to measure a patient's pulse and blood

17  oxygenation.  Pulse oximetry systems consist of monitors ("sockets"), sensors, and cables

18  ("consumables").  In a typical system, a clinician clips a patient's finger to a sensor that is

19  connected by cable to a monitor.  The sensor shines red- and infrared-spectrum light through the

20  patient's finger, and the system calculates the oxygenation of the patient's blood by accounting

21  for the different light absorption characteristics of oxygenated and non-oxygenated blood

22  hemoglobin.

23       Monitors represent a substantial initial expense for hospitals.  They are available as stand-

24  alone devices, which are generally compatible with a specific brand of sensors, and multi-

25  parameter devices, which may be compatible with multiple brands of sensors.  Competitors Tyco

26

27

28  _____

[3] Plaintiffs allege that several other Tyco practices, while not independent violations of the Sherman Act,
contributed to the Plaintiffs' injury.

1 | and Masimo Corporation ("Masimo") manufacture stand-alone monitors, and a number of third-
2 | party original equipment manufacturers ("OEMs") manufacture multi-parameter monitors.

3 |      Sensors cost a small fraction of the amount involved in monitors.  Tyco's sensors are
4 | available in both reusable or disposable forms, and for the latter, as recycled products.  Tyco
5 | offers a broad range of sensors with varying characteristics and prices, including sensors that are
6 | specialized for different patient populations (i.e. adult, pediatric, or infants) and attach to
7 | different sites on patients' bodies such as the nose, ear, forehead, and finger.

8 |      Through its subsidiaries and predecessors, Tyco has been in the pulse oximetry business
9 | since 1983.  Its pulse oximetry technology was initially protected by the "R-Cal" patents, which
10 | prevented competitors from entering the market for consumables compatible with R-Cal
11 | monitors.  After these patents expired in November 2003, several generic sensor manufacturers
12 | in the United States began to offer for sale R-Cal compatible sensors.  These include Masimo,
13 | Dolphin Medical Systems, Philips Medical Systems and General Medical Systems.  Defs.' Stmt.
14 | of Undisp. Facts ¶¶65-68.

15 |      Tyco has more recently begun to promote its next-generation OxiMax monitors and
16 | sensors, some of the details of which are in dispute here.  It is undisputed that existing R-Cal
17 | monitors are compatible with OxiMax sensors, but OxiMax monitors are not compatible with R-
18 | Cal sensors (and thus, the sensors made by generic manufacturers).  Also, because many aspects
19 | of the OxiMax technology are patent-protected,[4] generic manufacturers cannot produce OxiMax-
20 | compatible sensors without potentially infringing Tyco's intellectual property.

21 |      Also at issue in this case are Tyco's market-share agreements, which provide favorable
22 | pricing to hospitals that commit to purchase a specified percentage of their oximetry needs from
23 | Tyco, and sole-source Group Purchasing Organization ("GPO") contracts, which offer GPO
24 | member hospitals superior pricing if they agree to purchase all of their oximetry needs from
25 | Tyco.

26

27

28 | [4] At the Court's request, the parties submitted a Joint Submission Re: Patents on June 9, 2008 describing the patents
that cover OxiMax technology.  The relevance of these patents is discussed in greater detail in Section III.B, *infra*.

1    **B. Plaintiffs' Allegations**

2    According to Plaintiffs, Tyco's introduction of OxiMax was "little more than a 'lock out'

3    strategy" to switch hospitals to a system incompatible with generic sensors.  Compl. ¶7.

4    Plaintiffs allege that the system foreclosed generic manufacturers from the market while offering

5    "little if any improvement or innovation to the technology already existing in the marketplace"

6    that would justify these exclusionary effects.  *Id.*  The Complaint also includes allegations that

7    Tyco's sole-source contracts and market-share agreements are exclusionary contracts that form

8    part of a "plan…to deny competing manufacturers access to hospitals."  Compl. ¶¶63-75.

9

10   **C. Prior History**

11   Masimo, Tyco's closest pulse oximetry competitor, challenged sole-source and market-

12   share agreements and other Tyco practices under the antitrust laws in an earlier case before this

13   Court.  *See Masimo Corp. v. Tyco Health Care Group, L.P.*, No. CV 02-4770 MRP, 2006 U.S.

14   Dist. LEXIS 29977 (C.D. Cal. Mar. 22, 2006).  The Class Certification Order entered in this case

15   explains the background of *Masimo* and its relationship (or lack thereof) to this case.  *See* Class

16   Certification Order, at 5-14.

17   Of note, that case concerned the effects of Tyco's practices on competitor Masimo.[5]  The

18   instant case is "entirely different" and focuses on overcharges paid by customers on pulse

19   oximetry consumables as a result of Tyco's foreclosure of generic sensor manufacturers.  *See*

20   Pls.' Opp. at 25 ("While Tyco may prefer to retry the *Masimo* case, Plaintiffs' claims are entirely

21   different and focus on the impact of Tyco's practices on generic competition.").  This raises a

22   host of issues absent in the prior case, as generic sensors and OxiMax were not directly at issue

23   there.  Further, the relevant time period here is markedly different: the jury in *Masimo* found that

24

25   _____

26   [5] The Court mentions the previous case because, as initially filed, Plaintiffs' complaint concentrated on the
     overcharges that purchasers incurred on pulse oximetry systems resulting from Tyco's foreclosure of Masimo.

27   Plaintiffs intended to invoke collateral estoppel to establish several factual issues, such as "the appropriate relevant
     product in geographic markets, the extent of Tyco's conduct, and [whether it was] violative of Section 2 [and]

28   Section 1 of the Sherman Act [and] the various components or types of conduct that gave rise to the liability – the
     bundling contracts, the exclusive dealing contracts, [and] the co-marketing agreements with O.E.M.s."  March 2,
     2006 Scheduling Conference Tr. at 16:22-17:7.

-4-

Tyco's practices did not injure Masimo after July 1, 2001; the case here involves overcharges incurred by purchasers "during the period November 12, 2003 through the present" (which is after the expiration of the R-Cal patents), *see* Pls.' New Class Cert. Memorandum, at 1.

## II.

## LEGAL STANDARD

### A.  Summary Judgment

A court must grant a motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In order for the nonmoving party to prevail, there must be evidence sufficient to allow a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In assessing a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

### B.  Section 1

Section 1 of the Sherman Act prohibits "every contract, combination...or conspiracy, in restraint of trade or commerce."  15 U.S.C. §1.  A Section 1 claim requires (1) an agreement, conspiracy, or combination among two or more distinct entities; (2) intent to harm or unreasonably restrain competition; and (3) causal injury to competition.  *McGlincy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir. 1988).  Exclusive dealing arrangements do not constitute per se violations of Section 1 and are analyzed under the rule of reason.  *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1303 (9th Cir. 1982).  Thus, the fact-finder must decide whether, under all the circumstances of the case, a challenged practice imposes an unreasonable restraint on competition.  *McGlincy*, 845 F.2d at 811 n.3.

**C. Section 2**

Section 2 prohibits monopolization and attempts to monopolize, and a Section 2 claim requires (1) the possession of monopoly power in the relevant market; (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident; and (3) causal antitrust injury. *Cal. Computer Products, Inc. v. IBM Corp.*, 613 F.2d 727, 735 (9th Cir. 1979) ("*CalComp*"). *See also City of Vernon v. Southern Cal. Edison Co.*, 955 F.2d 1361, 1365 (9th Cir. 1992).

## III.

## DISCUSSION

Tyco moves for summary judgment on both Plaintiffs' Section 1 and 2 claims. The Court recognizes that Plaintiffs "should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). For analytical clarity, however, it is necessary to discuss each component of anticompetitive conduct individually before considering them collectively. *See CalComp*, 613 F.2d at 746. Moreover, because Plaintiffs have never suggested that Tyco's decision to promote OxiMax can raise liability as a "contract, combination…or conspiracy in restraint of trade," 15 U.S.C. §1, the Court considers only market-share and sole-source agreements as potential violations of Section 1. Under Section 2, the Court analyzes Tyco's product redesign, both independently and in conjunction with Tyco's other conduct that allegedly propagated OxiMax in an anticompetitive manner.

**A. Section 1**

**1. Tyco's Market-Share Agreements**

Market-share agreements allow smaller hospitals, which have less purchasing volume and bargaining power, to access larger discounts on pulse oximetry sensors. Defs.' Stmt. of

1   Undisp. Facts ¶43.  Tyco explains that each hospital entering into a market-share agreement with

2   Tyco signs a "commitment form" that "identif[ies] the percentage of sensors it intends to

3   purchase from Tyco and thus the particular discount for which it hopes to qualify."  Defs.' Mem.

4   at 26.  However, the hospital is free to purchase more or less than the stated commitment.  If it

5   commits to buying a specified percentage of its pulse oximetry sensors from Tyco but decides

6   for whatever reason not to meet that level, it is still eligible for smaller discounts that correspond

7   to the level of Tyco sensors it actually purchases.  Defs.' Stmt. of Undisp. Facts ¶42.

8           Here, Tyco's market-share agreements do not create an unreasonable restraint on

9   competition.  They do not contractually obligate hospitals to buy any Tyco sensors at all – even

10  where hospitals have stated a commitment to do so.  In fact, the only direct consequence for a

11  hospital that fails to meet its compliance level is "potentially being charged the price that reflects

12  its actual tier level of purchases."  Defs.' Mem. at 24.  The challenged market-share agreements

13  are also terminable on short notice, *see* Defs.' Stmt. of Undisp. Facts ¶39, a factor given

14  significant weight by the Ninth Circuit.  *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157,

15  1163 (9th Cir. 1997) (holding that easy terminability of exclusive dealing contracts "negate[s]

16  substantially their potential to foreclose competition").  On the other hand, Plaintiff DHLC

17  suggests it was not entirely free to walk away from its market-share contract.  *See* Pls.' Opp. at

18  23 n.18 ("You don't get the pricing unless you make the commitment . . . the choice is not

19  exactly a choice.").  But by itself, the fact that Tyco's sensor pricing is dependent on

20  commitment level does not suggest coercion or an unreasonable restraint.[6]

21

22

23  _____

[6] Plaintiffs, citing Prof. Frech's report, highlight an additional reason why hospitals seeking to terminate market-
24  share agreement or deviate from its terms may not be able to do so.  Pls.' Opp. at 23 n.17 ("If the buyer purchases a
    competitor's product that will make the buyer non-[compliant] with the terms of the exclusionary agreement, the
25  buyer will forfeit access to the lower price level.  Thus, the cost of that decision is not only the nominal price of the
    competitor's product, but opportunity cost of the foregone savings on all other purchases from the dominant
26  producer.") (citing Opper Decl., Exh. 4 (Frech Expert Report ¶119)).  However, Prof. Frech provides a single
    example: the scenario in which a hospital violates the requirement to maintain a certain percentage of Tyco-branded
    monitors.  *See id*. (Frech Expert Report ¶120) ("If the hospital replaces [a monitor] with a non-Tyco oximeter, it
27  loses the 37 percent discount off list price not just for sensors it uses with that machine, but also on sensors used
    with the other...Tyco oximeters in its installed base.").  This is irrelevant to the issue of whether the market-share
28  compliance requirement as to sensors is anticompetitive.  Here, Plaintiffs complain only about Tyco's practices with
    regards to sensors, no matter how relevant monitors may be in practice.

1    For this reason, Plaintiffs' reliance on this Court's findings in *Masimo* is misplaced.  In

2  *Masimo*, a jury found that Tyco's market-share agreements violated Section 1 of the Sherman

3  Act.  *See Masimo,* 2006 U.S. Dist. LEXIS 29977, at *3-5.  In affirming those jury findings, this

4  Court found that Tyco's market-share agreements were unreasonably restrictive of competition,

5  despite being easily terminable on their face, primarily because "[a] number of hospitals were

6  financially locked into purchasing…Tyco sensors to support their installed Tyco monitors."  *Id*.

7  at *17.  But the findings in *Masimo* are no longer applicable here for three reasons.  First, the

8  jury in that case concluded that Masimo, then a new entrant to the pulse oximetry market, did not

9  suffer damages from Tyco's anticompetitive conduct after July 2001, and the Court gave weight

10  to that factual finding.[7]  *See id*. at *7-8.  Second, the jury also determined that, in July 2001,

11  Masimo gained the technological ability to convert whole hospitals from Tyco to Masimo

12  oximetry products.  By this date, hospitals were no longer financially locked into buying Tyco

13  oximetry supplies, as they had the option to transition to Masimo.[8]  And third, after the

14  expiration of the R-Cal patents and the introduction of generic R-Cal sensors in 2003, hospitals

15  were no longer forced to purchase R-Cal sensors directly from Tyco because they could buy

16  them from any generic manufacturer.  A hospital's R-Cal monitor base, which in *Masimo* was a

17  factor that "locked" hospitals into purchasing Tyco sensors, is now a factor that enables them to

18  switch to generics.  For all these reasons, *Masimo* does not support a Sherman Act violation here.

19    Moreover, Plaintiffs' theory does not explain how market-share agreements cause market

20  foreclosure.  Plaintiffs' expert, Professor Frech, believes that the price of sensors purchased

21  under a market-share agreement is not competitive: while "more favorable than the price absent

22

23  _____

[7] In their opposition, Plaintiffs argue that the jury finding that anticompetitive harm ceased in July 2001 means only
that Tyco's anticompetitive impact on <u>Masimo</u> ended at that time – and therefore, the jury verdict is evidence that

24  Tyco's contracting practices still have anticompetitive effect on the oximetry market today.  They note that after a
retrial of the damages issue in Masimo, this Court stated that regardless of whether July 2001 was a watershed for

25  Masimo, "the record before the jury did not unambiguously establish July 2001 as a watershed for the oximetry
*market*."  *Masimo Corp. v. Tyco Health Care Group, L.P.*, No. CV 02-4770 MRP, at *7 (C.D. Cal. June 7, 2007).

26  However, the Court's damages order pertained only to Masimo, not the oximetry market at large.  It qualified the
jury's factual finding regarding July 2001 in only one respect: by holding that Masimo was entitled to some measure

27  of damages for sales of sensors lost after July 2001 that were tied to sales of sockets (monitors) that were lost before
July 2001.  *Id*. at *10.  It did not contradict the temporal limitation on anticompetitive harm found in *Masimo*.

28  [8] Notably, Abington, a former plaintiff in this case, converted its entire monitor base to Masimo in January 2008.
Defs.' Stmt. of Undisp. Facts ¶159.

the agreement," it is merely a reduction off the full list price.  Pls.' Opp. at 23; Opper Decl., Exh. 4 (Frech Expert Report ¶¶117-118) (characterizing market-share as providing discount off the "monopoly or penalty price").  By offering discounts that are not really discounts, Tyco is essentially "paying the hospitals to be compliant."[9]  Opper Decl., Exh. 5 (Frech Rebuttal Report ¶23).  However, "[a]greeing to exclusionary contractual arrangements is consistent with the rational self-interest of each buyer," because it is still better to receive the discount than not. Opper Decl, Exh. 5 (Frech Rebuttal Report ¶13); s*ee also* Pls.' Stmt. of Gen. Issues ¶35.  This leads to a "collective action problem" that results in the market-wide exclusion of generic sensors.  Opper Decl., Exh. 5 (Frech Rebuttal Report ¶13).  For this reason, Dr. Frech concludes that market-share arrangements create substantial market foreclosure regardless of their terminability.

But regardless of whether Tyco's discounts represent a penalty price or involve kickbacks to hospitals, they do not "force" hospitals to do anything.  Participation in the market-share program is voluntary and can be ended at any time, and hospitals are thus free to switch to more competitively priced generics.  This is especially true given that Plaintiffs assert that (i) market-share discounts are not in fact competitive and (ii) hospitals are highly price-sensitive with respect to sensor purchases, *see* Pls.' Stmt. of Gen. Issues ¶89.  It is impossible to articulate a scenario, based solely on price, where price-sensitive hospitals would remain wedded to market-share arrangements if a switch to generics would serve them better.  Plaintiffs are left arguing that market-share discounts were low enough to be attractive to hospitals, yet still high enough to be anticompetitive.

Nor can Professor Frech's "collective action" theory rectify this defect in Plaintiffs' theory.  Due to the availability of generics, it is not necessarily true that remaining in compliance with market-share contracts is "consistent with the rational self interest of each buyer," Opper Decl, Exh. 5 (Frech Rebuttal Report ¶13).  And if individual market-share arrangements do not violate the antitrust laws, it is difficult to conclude they are unreasonably restrictive of

---

[9] Specifically, Tyco compensates buyers for reduced choice by "shar[ing] part of the rent gained from the...monopoly power resulting from the exclusionary agreement."  Opper Decl., Exh. 4 (Frech Expert Report ¶117).

1   competition in the aggregate.  The fact that generics have failed to penetrate the R-Cal sensor

2   market, standing alone, is not evidence that market-share agreements, in the aggregate, are an

3   unreasonable restraint on competition.  Plaintiffs do not demonstrate a causal link between the

4   lack of success of generics and Tyco's market-share arrangements.[10]

5         The Court addresses two additional aspects of Plaintiffs' theory.  First, Plaintiffs argue

6   that individual hospitals' desire to standardize on one kind of sensor is another reason why

7   market-share contracts "effectively prevent" them from buying competing sensors.  Pls.' Stmt. of

8   Gen. Issues ¶34.  For hospitals that commit to purchase a high percentage of their sensors from

9   Tyco (85-95%), considerations of efficiency will "drive the hospital towards 100 percent

10  standardization" upon Tyco products.  *See* Opper Decl., Exh. 4 (Frech Expert Report ¶¶119-

11  120).[11]  However, standardization does not independently explain why market-share

12  arrangements are anticompetitive, nor is it a factor that necessarily favors Tyco in every

13  situation.  As Prof. Frech explains, the tendency to standardize results in "foreclosing sales even

14  beyond the actual market-share threshold," Opper Decl., Exh. 5 (Frech Rebuttal Report ¶14).

15  Thus, if market-share contracts were already shown to be an unreasonable restraint on

16  competition, hospitals' tendency to standardize could intensify their anticompetitive effect.  But

17  standardization causes no further harm where hospitals are free to either terminate their market-

18  share agreements or buy any quantity of sensors from another manufacturer.

19        Second, Plaintiffs argue that even if market-share agreements by themselves are not

20  unreasonably restrictive of competition, noncompliance with market-share sensor purchase

---

23  [10] Nor is Plaintiffs' case aided by their citation to Professor Einer Elhauge, *Loyalty Discounts and Naked Exclusion*,

24  John M. Olin Center for Law, Economics, and Business, Discussion Paper No. 608, February 2008.  Professor Elhague's article, which appears to depart from much of the current literature, argues that loyalty discounts such as

25  market-share arrangements always (or almost always) have anticompetitive effects.  *See, e.g.*, *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997) ("There are, however, well-recognized economic benefits to

26  exclusive dealing arrangements, including the enhancement of interbrand competition.").  However, his work is unpublished (and thus may not have attained its final form) and highly theoretical.  As Plaintiffs have failed to

27  explain why this theory, which differs in significant ways from Dr. Frech's, should be applicable to their particular real-world situation, the Court declines to consider it here.

28  [11] These considerations include factors such as the need for uniformity in training, service, and compatibility.  Pls.' Stmt. of Gen. Issues ¶34.

requirements can result in the loss of benefits under Co-OP, an equipment financing program.[12] Pls.' Stmt. of Gen. Issues ¶34.  If a hospital fails to meet market-share requirements, a hospital may be required to return, or pay for, capital equipment received under that program.  Opper Decl., Exh. 4 (Frech Expert Report ¶142) (noting a market-share requirement for sensors is typically incorporated into the Co-OP agreement itself).  However, like stand-alone market-share arrangements, the Co-OP program does not involve any element of coercion.  If hospitals do not meet their sensor purchase requirements under the contract, they are obligated only to return equipment that was initially provided without cost.

## 2.  Tyco's Sole-Source Contracts with GPOs

In contrast with market-share agreements, which are negotiated directly between Tyco and small hospitals, sole-source contracts are pre-negotiated between Tyco and GPOs.  Hospitals that belong to those GPOs may then purchase Tyco products at the previously agreed-upon price. Sole-source contracts offer better pricing to customers who limit their pulse oximetry purchases to Tyco.

Despite these differences in structure, the parties do not address sole-source contracts separately from their arguments on market-share arrangements.  Tyco argues that the same considerations apply (the contracts are easily terminable, and do not obligate member hospitals to purchase sensors), and observes that sole-source contracts are of relatively small significance in this case.  Plaintiffs, for their part, emphasize that the jury in *Masimo* found Tyco's sole-source contracts to be anticompetitive, "notwithstanding the[ir] apparent terminability on short notice."  Pls.' Opp. at 23.

In *Masimo*, this Court found that Tyco's sole-source contracts with the Premier and Consorta GPOs prior to July 2001 violated the antitrust laws because they contractually required members to purchase 90% and 85%, respectively, of their sensor requirements from Tyco.  *See*

---

[12] Despite its prominence in their overall case, Plaintiffs no longer allege that the Co-OP program is an independent practice that violates Section 1 or any other provision of the antitrust laws.  *See* Compl.  Also, it is worth noting that the jury in *Masimo* determined that Tyco's equipment financing programs were lawful.  *See Masimo,* 2006 U.S. Dist. LEXIS 29977, at *4.

1   *Masimo,* 2006 U.S. Dist. LEXIS 29977, at *21.  Even though the sole-source agreements were

2   terminable by the GPOs on 90 days notice, the Court determined that these GPO contracts were

3   "effectively long term" with respect to member hospitals; and in order to get out of their

4   contractual obligations, hospitals "would either have to leave the GPO or ask the GPO to

5   terminate [the] agreement."  *Id.* at *22.  However, this Court also found that a sole-source

6   contract between Tyco and another GPO, Novation, was not anticompetitive because it explicitly

7   stated that no member hospital was required to buy any oximetry products from Tyco.  *Id.* at *21.

8        As with market-share, dramatic changes in the landscape of today's pulse oximetry

9   market render irrelevant *Masimo*'s pre-July 2001 factual findings with respect to sole-source

10   contracts.  Only two GPOs, Health Trust and Consorta, had sole-source contracts between

11   November 12, 2003 and the present.  Defs.' Stmt. of Undisp. Facts ¶26.  These contracts account

12   for less than 13% of pulse oximetry purchases, which makes it difficult to suggest that they

13   foreclose any significant part of the market today.  Defs.' Stmt. of Undisp. Facts ¶26.  Tyco has

14   introduced evidence that most GPOs have already switched away from Tyco sole-source

15   contracts.  *See, e.g.*, Defs.' Stmt. of Undisp. Facts ¶¶20-23 (noting that the Amerinet, Premier,

16   Novation, and Broadlane GPOs have had dual-source or multi-source contracts with Tyco for

17   pulse oximetry products from the end of 2003 onward).[13]  In addition, the two sole-source

18   contracts at issue here do not require GPO member hospitals to purchase any or all of their

19   oximetry supplies from Tyco, resembling in this respect the permissible Novation contract in

20   *Masimo*.

21        Plaintiffs suggest that GPO member hospitals were in fact restricted to purchasing to

22   Tyco because off-contract purchases would render them "non-compliant," forcing them to forfeit

23

24

---

25   [13] Plaintiffs present minor corrections to Tyco's evidence.  For example, they note that Amerinet had a dual source,

26   not a multi-source, agreement from 2002-2006, and that Premier has a multi-source agreement, not a dual-source
agreement.  Pls.' Stmt. of Gen. Issues ¶¶20, 21.  Plaintiffs further note that, despite the easy terminability of sole-
source contracts, switching from sole-source to dual source would come at a cost to GPOs because Tyco paid a 3%

27   administrative fee for sole-source contracts but only 2% for dual source.  Pls.' Stmt. of Gen. Issues ¶28.  *See
generally* Opper Decl., Exh. 4 (Frech Expert Report ¶46) ("GPOs typically collect revenue from administrative fees
paid to them by manufacturers").  However, the general trend away from sole-source contracts is not in dispute.  *See*

28   *generally* Opper Decl., Exh. 4 (Frech Expert Report ¶132) ("After Senate hearings on the anticompetitive nature of
sole-source GPO contracting, several GPOs…began to offer dual- or multi-source contracts to their members.")

1   access to pricing discounts under the contract.  Pls.' Stmt. of Gen. Issues ¶19.  However, pricing

2   discounts based on volume are precisely the reason for having a sole-source contract.  The

3   difference between this case and *Masimo*, of course, is the element of free choice: members of a

4   GPO that have sole-source contracts with Tyco can choose not to utilize it at all.  Furthermore, at

5   least some hospitals belong to more than one GPO and may have the alternative of purchasing

6   other oximetry brands under an alternative GPO contract that is dual- or multi-sourced.[14]  For

7   these reasons, the fact that they would lose the preferential pricing under the sole-source contract

8   is not evidence of anticompetitive harm.

9

10          **3.  *PeaceHealth***

11          Because the Court finds that the market-share and sole-source contracts do not violate

12   Section 1 of the Sherman Act, it does not decide whether Tyco's discounts are, pursuant to

13   *PeaceHealth*, categorically immunized from antitrust liability because they are above cost.  *See*

14   *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008).  However, Tyco's

15   argument on this point merits further analysis.

16          A recent development in Ninth Circuit antitrust jurisprudence, *PeaceHealth* invokes an

17   earlier Supreme Court decision, *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509

18   U.S. 209 (1993), to establish the rule that above-cost pricing "will not be considered

19   exclusionary conduct for antitrust purposes."  *Id*. at 901.  *Brooke Group* involved pricing of a

20   single product and considered two theories of harm, predatory pricing and primary-line price

21   discrimination.  *See* 509 U.S. at 221-223.  The harm complained of under both of these theories

22   is that a defendant priced its product below cost with the intent to drive a competitor out of

23   business.  *Id.*  Thus, it was natural for the Supreme Court in that case to require a showing that a

24   competitor defendant had priced that product below cost.[15]  *Id.*

25

26   _____

27   [14] Dr. Frech's original report states that Health Trust, as of 2002, imposed a requirement that its members not belong
     to any other GPO.  Opper Decl. Exh. 4 (Frech Expert Report ¶136).  Regardless of whether this is still the case,
     GPO members retain the choice not to purchase under the sole-source contract.

28   [15] More accurately, *Brooke Group* held that the plaintiff had to demonstrate that (i) the defendant's low prices were
     below an appropriate measure of its costs; and (ii) that the defendant had either a "reasonable prospect," under the

-13-

1       Reasoning between the lines of *Brooke Group*, *PeaceHealth* found that <u>above</u>-cost

2   pricing is presumptively legitimate in the related context of multiple-product pricing.  Relying in

3   part on this premise, *PeaceHealth* creates a bright-line formula for evaluating the anticompetitive

4   effect of bundling practices – situations in which a discount is offered for purchasing several

5   products as a package, over the cost of purchasing each product separately.  *See* 515 F.3d at 906.

6   However, neither *PeaceHealth* nor *Brooke Group* transform that tenet into an absolute principle

7   that is applicable to all antitrust cases.  *See, e.g., id.* at 901 (noting that the Supreme Court has

8   never stated such a rule).

9       At least formally, there is one important distinction between this case and the above-

10  mentioned precedents: both *PeaceHealth* and *Brooke Group* are fundamentally concerned with

11  an antitrust injury that arises from product pricing.  In contrast, the essence of the antitrust injury

12  in a Section 1 claim is not pricing – it is the unreasonable restraint upon competition arising from

13  an agreement between two or more parties.  The Section 1 inquiry does not and cannot end at

14  pricing.  It must also encompass the obligations and conduct that flow from the parties'

15  agreement, because the proper inquiry is whether a given contracting practice is intended to harm

16  or unreasonably restrain competition, and in fact does cause harm to competition.  *McGlincy*,

17  845 F.2d at 811; *cf.* 15 U.S.C. §14 (Clayton Act, §3) (making unlawful any exclusive dealing

18  contract "where the effect...may be to substantially lessen competition or tend to create a

19  monopoly," without regard to whether the pricing is above or below cost).

20      Of course, in practice, the distinction between pricing and contract becomes somewhat

21  less clear, particularly with respect to the market-share theory in this case, where the harm

22  complained of has less to do with a contractual obligation[16] and more to do with price.  Indeed,

23  Plaintiffs' and Dr. Frech's market-share theory admittedly rests on "a pricing structure that

24  induces exclusivity."  Opper Decl., Exh. 4 (Frech Expert Report ¶117).  This is true to a lesser

25  extent for sole-source contracts, which, though similar to market-share agreements in some

26

27  Robinson-Patman Act, or a "dangerous probability," under §2 of the Sherman Act, of recouping its "investment" in
below-cost prices.  509 U.S. at 224.

28  [16] Notably, market-share arrangements do not lock hospitals into affirmatively buying Tyco products and are
terminable on short notice.

respects, involve the addition of a GPO that may make the agreements somewhat more difficult to terminate.

In the end, this Court is not persuaded that *PeaceHealth* establishes a per se rule of nonliability under Section 1 for contractual practices that involve above-cost pricing.  Such practices may or may not involve a strong pricing component, and neither *PeaceHealth* nor *Brooke Group* itself offer a theoretical justification for extending the above-cost standard to exclusive dealing contracts.  Tyco's own justification for such a rule is merely a retread of its original arguments regarding the legality of market-share and sole-source discounts.  Those arguments, which the Court has already found persuasive here, suggest no further reason to impose a per se rule.

## B.  Section 2

Plaintiffs' Section 2 allegations center around the newly introduced OxiMax platform.  Of course, Tyco's introduction of new products cannot, in and of itself, violate Section 2 of the Sherman Act.  *See Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 545 (9th Cir. 1983) ("In all cases…it is not the product introduction itself, but some associated conduct, that supplies the violation.") (citations omitted).  The Court begins by framing this complex case in terms of the associated conduct that composes the OxiMax-related allegations.

First, Plaintiffs allege that Tyco discontinued its R-Cal monitors and introduced OxiMax monitors that were not backwards-compatible with R-Cal sensors.  *See, e.g.,* Compl. ¶78.  Plaintiffs' theory extends beyond the newly introduced incompatibility: it suggests that Tyco's OxiMax patents preclude generic manufacturers from producing OxiMax-compatible generic sensors.  *Id.* at ¶79 ("Tyco pursued the goal of adopting new patentable sensor technology").  The scope and relevance of Tyco's patent protection is undeveloped at this stage of the case in light of its significance to this case.[17]  In view of the posture of this motion, the Court proceeds

---

[17] Until the June 4, 2008 telephone conference with the parties, the record failed to describe the existence of patent protection on OxiMax in more than a conclusory fashion.  When the Court expressed some surprise at this failing, both parties responded that it is undisputed that the OxiMax "technology" is patented by Tyco.  June 4, 2008

-15-

1  under the assumption that Tyco's patents preclude generic sensor manufacturers from selling

2  OxiMax-compatible sensors.[18]

3      Second, Plaintiffs allege that Tyco converted customers from the old to the new

4  technology in an unreasonable manner, in part by obsolescing its R-Cal monitors and entering

5  into the market-share and sole-source agreements discussed in the context of Section 1.  Compl.

6  ¶81.  Thus, the allegations here are not simply that Tyco introduced a new and incompatible

7  product, but that it leveraged its position as a monopolist of pulse oximetry consumables[19] to

8  propagate new monitors compatible only with Tyco's patent-protected OxiMax sensors.  In

9  doing so, Tyco extended its monopoly on consumables anticompetitively, by "locking"

10  customers into this new technology.

11      The Court proceeds by addressing each of these sets of allegations in turn.

12

13  **1.  Tyco's Design Changes and Plaintiffs' Disputes**

14      **a.  Legal Standard**

15      The parties dispute the appropriate interpretation of Ninth Circuit case law governing

16  antitrust liability for product redesigns.  An appropriate starting point is the Ninth Circuit's

17  decision in *CalComp*, 613 F.2d at 735.  In *CalComp*, the Ninth Circuit affirmed a district court's

18  directed verdict judgment in favor of IBM, the monopolist who allegedly violated Section 2 by

19

20  Telephone Conference Tr. at 4:15-4:16, 5:5-5:6.  The Court again emphasizes that even if the general facts are undisputed, the details, disputed or not, are essential to understanding the reality of this case.

21  [18] A very relevant question, in particular, is whether generic sensor manufacturers can produce OxiMax-compatible sensors without infringing Tyco's patents.  Generic sensor manufacturers would likely not be blocked by Tyco's patents on

22  OxiMax monitor technology.  It remains unclear whether they are blocked by the other OxiMax patents, and whether it is possible to create OxiMax-compatible sensors without implementing the features represented by those

23  patents (which Plaintiffs claim lack real clinical value).  If it is possible, for example, to create OxiMax adapters for R-Cal sensors without infringing Tyco's patents, Tyco's conduct would at most delay generic entry until such

24  adapters could be produced, which is a slightly different theory that has clearly been rejected by the Ninth Circuit. *See CalComp*, 613 F.2d at 744 (stating that a monopolist has no obligation to provide its rivals with its new products

25  for reverse-engineering and copying purposes).  Alternatively, if Tyco remains conducive to licensing its OxiMax technology then generic manufacturers could continue to compete in the sensor market, albeit with increased costs

26  due to licensing fees.

27  [19] Tyco appears to concede the presence of genuine issues of fact on the first factor under Section 2 – in particular, the relevant product market definition of "pulse oximetry consumables" and whether Tyco possessed monopoly power in that market.  For purposes of this motion, the Court views Tyco as a monopolist in a pulse oximetry

28  consumables product market. *See Liberty Lobby*, 477 U.S. at 255.  The parties agree that the United States is the appropriate geographic market.

1   making design changes on "certain of its CPUs, disk drives, and controllers of no technological

2   advantage and solely for the purpose of frustrating competition from plug-compatible

3   manufacturers." *Id.* at 739.  IBM manufactured both central processing units ("CPUs") and

4   external disk drives that plugged into the CPUs.  *Id.* at 731.  CalComp, by reverse engineering

5   IBM's products, produced disk drives that were "plug compatible" with IBM CPUs and

6   competed with IBM in the sale of those drives.  *Id*.  IBM altered the interface between CPUs and

7   disk drives by moving certain control function technology from the disk drives into the CPUs.

8   *Id.* at 743-744.  IBM's design change rendered CalComp's drives incompatible with its CPUs,

9   and as a result, CalComp was forced to redesign its drive after IBM began shipping its new

10   technology.  *Id.*  The Ninth Circuit applied a test that considered whether IBM's acts "were

11   [u]nreasonably restrictive of competition."  *Id.* at 735-736.  The court held in favor of IBM

12   because "assuming it was a monopolist, [it] had the right to redesign its products to make them

13   more attractive to buyers whether by reason of lower manufacturing cost and price or improved

14   performance" – and there was evidence on the record that the changed design improved

15   performance and potentially reduced cost and size.  *Id.* at 744.  IBM "was under no duty to help

16   Calcomp or other peripheral equipment manufacturers survive or expand" and it "need not have

17   provided its rivals with disk products to examine and copy."  *Id.  See also ILC Peripherals*

18   *Leasing Corp. v. IBM Corp.,* 458 F. Supp. 423, 438 (N.D. Cal. 1978) ("Where there is a

19   difference of opinion as to the advantages of two alternatives which can both be defended from

20   an engineering standpoint, the court will not allow itself to be enmeshed in a technical inquiry

21   into the justifiability of product innovations."), *aff'd sub nom. Memorex v. IBM*, 636 F.2d 1188

22   (9th Cir. 1983).

23        In *In re IBM Peripherals EDP Devices Antitrust Litig.*, 481 F. Supp. 965 (N.D. Cal.

24   1979), the Northern District of California considered similar Section 2 allegations that IBM

25   modified the design of several interfaces between its CPUs and peripherals to the detriment of

26   competing peripheral manufacturers.  Relying on *CalComp*, the court explained that "[i]f the

27   design choice is unreasonably restrictive of competition, the monopolist's conduct violates the

28   Sherman Act."  481 F. Supp. at 1003.  It went further than *CalComp*, however, and continued

1    that such a standard "will allow the factfinder to consider the effects of the design on

2    competitors; the effects of the design on consumers; the degree to which the design was the

3    product of desirable technological creativity; and the monopolist's intent, since a

4    contemporaneous evaluation by the actor should be helpful to the factfinder in determining the

5    effects of a technological change." *Id.* In applying this test, the court found several of IBM's

6    interface design changes not unreasonably restrictive on competition, and determined that one

7    design decision would have violated the Sherman Act if IBM had possessed monopoly power

8    because there the "only purpose served and the only effect of the degradation was the preclusion

9    of competition." *Id.* at 1003-1007. The Ninth Circuit, on the authority of *CalComp* and

10   *Memorex*, affirmed the district court's ruling that the interface changes were not unreasonable.

11   *See Transamerica Computer Co. v. IBM Corp.*, 698 F.2d 1377, 1382 (9th Cir. 1983).

12        The Ninth Circuit reinforced its *CalComp* principle in *Foremost*, 703 F.2d at 534, where

13   it considered whether Kodak violated Section 2 by introducing a new photography technology

14   that purportedly required photofinishers like Foremost to purchase several ancillary products

15   from Kodak. *Id.* at 543. The court affirmed the district court's Rule 12(b)(6) dismissal, and

16   explained that, even assuming Kodak enjoyed monopoly power in the relevant market, it owed

17   no duty "to assist Foremost, other photofinishers, or manufacturers of competing cameras, film,

18   paper or chemicals to survive or expand." *Id.* at 545.

19        The parties have not cited and the Court is unaware of any Ninth Circuit authority after

20   1983 that directly evaluates a product design change under Section 2. In a related line of cases,

21   however, the Ninth Circuit has more recently discussed Section 2 liability for monopolists who

22   engage in business conduct to the detriment of its competitors. In *Oahu Gas Service, Inc. v.

23   Pacific Resources, Inc.*, 838 F.2d 360, 368 (9th Cir. 1988), Oahu Gas alleged that Pacific

24   Resources, whose subsidiary was a monopolist in propane, declined to produce propane gas

25   partially out of a fear that doing so would ultimately increase the market-share of competitor

26   Oahu Gas. *Id.* at 368. Pacific Resources, however, offered another justification for its conduct:

27   that government price controls rendered the investment in propane product economically

28   inefficient at that time. *Id.* The court held that while there was evidence on the record that the

1   monopolist's refusal to aid Oahu was "based partially on a desire to restrict competition,"

2   antitrust liability could not attach if there was "a legitimate business justification for the

3   monopolist's conduct." *Id.* at 368.  Pacific Resources' justification was sufficient to immunize it

4   from Section 2 liability, and accordingly, the Ninth Circuit reversed a jury finding of an antitrust

5   violation for that conduct. *Id*. at 368-369.  In reaching that decision, the Ninth Circuit relied on

6   the line of product innovation cases that "consistently rejected antitrust liability for a

7   monopolist's decision about when or whether to market new products." *Id.* at 369.  The *Oahu*

8   *Gas* court analogized the "business acumen" at issue in that case to the product innovation

9   concerns addressed in *CalComp*, which considered "specifically when a question of legitimate

10  business purpose may go to a jury." *Id.* at 369.  Such a question does not create a jury issue

11  where the design change was justified by the reasons described in *CalComp*: lower

12  manufacturing cost and price, or improved performance.  *Id.*[20]

13         The Court finds that *CalComp* continues to provide the relevant standard that only

14  product design changes that are "unreasonably restrictive of competition" can violate Section 2.

15  *CalComp* provided that product design changes are not unreasonable for Section 2 purposes

16  when they are justified by legitimate product innovation – and such a scenario does not present a

17  jury issue.  *See* 613 F.2d at 744.  *See also Oahu Gas*, 838 F.2d at 369 (describing *CalComp*).

18  The Ninth Circuit has neither conducted nor endorsed the multi-factor balancing test applied by

19  the Northern District of California in *In re IBM*.[21]  It also has not adopted the rule that a

20  legitimate procompetitive justification for the product redesign must be weighed against the

21  anticompetitive effects of the conduct, *see United States v. Microsoft*, 253 F.3d 34, 59 (D.C. Cir.

22  2001).[22]

23

24  [20] Other cases following *Oahu Gas* apply a similar rule in different scenarios.  *See, e.g., City of Vernon*, 955 F.2d at
    13;  *City of Anaheim v. Southern Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992);  *High Technology Careers*

25  *v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993).
    [21] The Ninth Circuit affirmed the conclusion of the district court as consistent with *Memorex* and *CalComp*.  It did

26  not endorse that court's multi-factor balancing test.
    [22] Both parties marshal non-controlling authorities in support of their interpretation of the Ninth Circuit's rule.  The

27  D.C. Circuit, for example, consistent with the holdings in the series of IBM cases, recognizes that "[a]s a general
    rule, courts are properly very skeptical about claims that competition has been harmed by a dominant firm's product

28  design changes."  *United States v. Microsoft*, 253 F.3d 34, 65 (D.C. Cir. 2001).  Nonetheless, in that Circuit the
    existence of a legitimate, non-pretextual procompetitive justification does not end the inquiry.  *See id.* at 59.  Section

1    Notably, the Ninth Circuit in *CalComp* ended its analysis of IBM's design changes once

2    it established that the new products improved the older designs.  It did not balance the benefits of

3    those improvements against the detrimental effects of the design changes on CalComp or

4    customers of IBM peripherals.  *See CalComp*, 613 F.2d at 744.  *See also C.R. Bard v. M3 Sys.,*

5    *Inc.,* 157 F.3d 1340, 1370 (Fed. Cir. 1998) (Newman, J., dissenting) (stating that, under

6    *CalComp*, "when the innovation is an improvement, that it affects competition is not an antitrust

7    violation, and no jury question arises").  Clearly the *CalComp* court was concerned about forcing

8    IBM, which had legitimately innovated, to "constrict[] its product development so as to facilitate

9    the sales of rival products."  613 F.2d at 744.  No differently, the Ninth Circuit in *Oahu Gas* did

10   not balance Pacific Resources' business justification against the harm suffered by Oahu Gas.  *See*

11   838 F.2d at 368-9.  It concluded that Pacific Resources' legitimate business justification

12   precluded antitrust liability.  *Id.* at 369.

13   Thus, the question for this Court is whether the undisputed evidence establishes that

14   OxiMax technology provides sufficiently legitimate innovation over previous generation R-Cal

15   technology to invoke the rule of *CalComp*.

16

17               **b.  The OxiMax Design as Compared to R-Cal**

18                    i.   Flexibility in the Design and Propagation of Sensors

19   It is undisputed that OxiMax was the first commercially available pulse oximetry

20   technology to include a digital memory chip in the sensor.  Pls.' Stmt. of Gen. Issues ¶128.  This

21   memory facilitated the storage of "calibration coefficients," used in the systems' calculations, in

22   the sensor rather than the monitor.  *See* Mannheimer Supp. Decl. ¶3.  Previously, R-Cal monitors

23

24   _____

25   2 liability can still attach if plaintiff "demonstrate[s] that the anticompetitive harm of the conduct outweighs the
     procompetitive benefit."  *Id.  See also In re Tricor Direct Purchaser Antitrust Litig.*, 432 F. Supp. 2d 408, 422 (D.

26   Del. 2006) ("[A]s in Microsoft, if Plaintiffs show anticompetitive harm from the formulation changes, that harm will
     be weighed against any benefits presented by Defendants").  In contrast, the authors of a leading antitrust treatise –

27   previous versions of which are cited in *CalComp* and *Oahu Gas* – "would require evidence that the innovator knew
     before introducing the improvement into the market that it was absolutely no better than the prior version, and that

28   the only purpose of the innovation was to eliminate the complementary product of a rival."  PHILLIP E. AREEDA &
     HERBERT HOVENKAMP, ANTITRUST LAW, ¶776d, 258 (2d ed. 2002).  Thus, "[a]ny finding of a genuine product
     improvement should generally defeat the antitrust claim." *Id.*¶776d5, 264.

were pre-programmed with a finite number of sets of calibration coefficients, with each set corresponding to a type of sensor.  *Id.*  The monitor would look up an R-Cal sensor's calibration coefficients from a table on the monitor using a resistor in the sensor as a pointer to the correct entry.  *Id.*  By storing calibration coefficients on the sensor, Tyco could introduce new sensor models with different calibration coefficients without having to upgrade or modify the monitors.  *See id.  See also* Defs.' Stmt. of Undisp. Facts ¶¶107-109.  With this feature, Tyco would be able to take advantage of newer high-efficiency light emitting diodes ("LEDs") produced by semiconductor manufacturers, and in theory, these LEDs could "dramatically increase[] signal strength and/or lower[] the power needs of oximeters."  Duss. Decl., Exh. 114 at 2647 (2002 Tyco document describing "Why [Tyco] Developed the OxiMax Pulse Oximetry System").[23] There is no suggestion here – or at least no undisputed suggestion – that storing the calibration coefficients on the sensor improves the accuracy of the systems' measurements.  *See, e.g.,* Opper Decl., Exh. 8 (Ehrenwerth Rebuttal Decl. ¶7).

Tyco markets two new sensors that take advantage of the flexibility of OxiMax.  *See* Defs.' Stmt. of Undisp. Facts ¶¶112, 119.  MaxFast, for example, is a forehead sensor that was introduced at the same time as OxiMax in March 2002.  *Id.* ¶¶112-114.  It uses a type of LED requiring different calibration coefficients than existed in prior pulse oximetry systems.  *Id.* ¶114. There is some evidence that this sensor made the OxiMax platform appealing to a number of customers, *see, e.g.,* Duss. Decl., Exh. 41 (West Depo. at 117:16-118:12) (explaining that OEM Phillips offers customers the option of Oximax, and some customers had articulated MaxFast as a reason to adopt OxiMax), and of the 2300 or so OxiMax sensor customers, 367 were purchasing MaxFast sensors, *see* Opper Decl., Exh 23 (Earp. Depo. at 552:11-553:9).  Tyco also offers the SoftCare OxiMax sensor and has developed a neonatal forehead reflectance sensor, NeoMax, which has not yet been released to the market.  Defs.' Stmt. of Undisp. Facts ¶116.

The enhanced flexibility establishes that Tyco's new design was an improvement in comparison to the previous generation technology where sensor innovation was technologically

_____

[23] This document is one of many that the parties cite as being probative of Tyco's intent in propagating OxiMax. The Court recognizes that Tyco's intent is a relevant consideration, and discusses it in Section III.B.3, *infra*.

1   limited by the monitors installed in the hospitals.  Indeed, Tyco's "platform of the future" mantra

2   may be an advertising slogan, but it effectively conveys that part of the appeal of OxiMax is the

3   platform itself and the flexibility it provides customers going forwards.  It also bears mention

4   that one of Tyco's patents explicitly covers an "Oximeter Sensor with Digital Memory

5   Recording Sensor Data," presumably the technological design change at issue here that Plaintiffs

6   argue is without value.  *See* U.S. Patent No. 6,591,123 (issued Jul. 8, 2003).  Another of Tyco's

7   patents covers a "Pulse Oximeter Sensor with Piece-Wise Function," which generally describes

8   "[a] memory in a sensor used to store multiple coefficients for a physiological parameter" – i.e.,

9   a set of calibration coefficients stored on a sensor.  U.S. Patent No. 6,801,797 (issued Oct. 5,

10   2004).[24]  While there may not be a per se rule barring Section 2 liability on patented product

11   innovation,[25] this Court cannot ignore the United States Patent and Trademark Office's

12   ("PTO's") determination that a sensor incorporating digital memory to store calibration

13   coefficients is sufficiently innovative over the prior art, including the expressly referenced R-Cal

14   technology prior art, to deserve a United States patent.[26]

15

16                      ii.   Other Features

17        Beyond enhanced flexibility in sensor development, Tyco's placement of a memory chip

18   on the sensor enabled two new features that could take advantage of the memory.  First, a

19   "sensor event reporting" feature stores "alarm condition events" in the sensor's memory.  *See*

20

21

22   [24] The technology incorporated in Tyco's specialty sensors, MaxFast and SoftCare, is protected by separate patents.
Joint Submission Re: Patents, at 2 n.1.

23   [25] *See, e.g., Xerox Corp. v. Media Sciences Int'l, Inc.*, 511 F. Supp. 2d 372, 388 (S.D.N.Y. 2007) (denying Xerox's
motion to dismiss a Section 2 claim on the pleadings, citing the absence of a per se rule that introduction of patented

24   product modification can never constitute prohibited anticompetitive conduct).  For the contrary view, see note 29, *infra*.

25   [26] At the hearing, Plaintiffs' counsel responded to this point with the puzzling statement that "the fact that Tyco got
patents for the particular OxiMax system products is not a finding by the [PTO]…that the patented products are in

26   any way an improvement over the existing technology," and that he did not think "there was any determination by
the [PTO] that [OxiMax] sensors…do something the previous sensors didn't do." Hearing Tr. at 33:15-34:6.  Basic

27   principles of patent law contradict counsel's view.  A threshold requirement for a United States Patent is the
invention or discovery of "any new and useful process, machine, manufacture, or composition of matter, or any new

28   and useful improvement thereof."  35 U.S.C. §101 (Patent Act).  In this case, the issued patents here expressly
reference R-Cal patents as prior art, so it appears that the PTO's patent grant on OxiMax sensor features is in fact a
determination that the sensors did "something the previous sensors didn't do."

1    Mannheimer Decl. ¶10.  Essentially, the chip records patients' pulse rate or "desaturation"

2    measurements if they "fall outside present high and low alarm thresholds programmed into the

3    monitor."  Opper Decl., Exh. 11 (Scharf Expert Report ¶40).  Once again, as suggesting the

4    innovativeness of the feature, the PTO granted Tyco a patent, entitled a "Method and Circuit for

5    Storing and Providing Historical Physiological Data", which states that its value is that

6    "historical physiological data is stored in a storage medium that 'travels' with the

7    patient…accessible wherever the patient is moved" and provides examples why systems without

8    this feature are less desirable.  U.S. Patent No. 6,463,310.

9         Second, a "sensor messaging" feature "provides information to the clinician about the

10   possible causes of and solutions for, a signal interruption" (i.e. where the sensor is not attached

11   to the patient correctly).  *See* Defs.' Stmt. of Undisp. Facts ¶127.  *See also* Mannheimer Decl.

12   ¶10.  The monitor might display conditions describing the poor signal acquisition such as "Weak

13   Signal", "Interference", or "Excess Infrared Light."  The system would then suggest an

14   adjustment because, for example, the sensor is too tight or attached to the wrong place, or the site

15   needs cleaning.  *See* Opper Decl., Exh. 11 (Scharf Expert Report ¶39).  According to Dr. Scharf,

16   this feature functions with a proprietary algorithm that considers the signal characteristics of the

17   sensor in use.  *Id.*

18

19                          iii.   Plaintiffs' Disputes

20        Plaintiffs do not dispute that Tyco's OxiMax design provided these features or that it

21   afforded the company increased flexibility in introducing new sensors.  *See, e.g.,* Pls.' Stmt. of

22   Gen. Issues ¶¶107, 110.  *See also* Compl. ¶83 (stating that "[t]he OxiMax idea was to place a

23   memory chip into the plug of each sensor…which could be programmed with information that

24   purportedly would enable the OxiMax system to offer enhanced features"); Opper Decl., Exh. 8

25   (Ehrenwerth Rebuttal Decl. ¶8) (explaining that Tyco has placed a digital chip in the sensor and

26   moved the calibration curves from monitor to sensor, providing greater flexibility in the

27   development of new sensors).

28

1    Instead, Plaintiffs dispute the value of each and every aspect of OxiMax, and argue that

2  any clinical benefit from the design change is to date largely speculative.  *See, e.g.*, Pls.' Stmt. of

3  Gen. Issues ¶¶107, 110.  Dr. Ehrenwerth opines, for example, that "whether or not [Tyco]

4  engineers may have greater flexibility in future sensor design is not necessarily a meaningful or

5  clinically significant improvement."  Opper Decl., Exh. 8 (Ehrenwerth Rebuttal Decl. ¶9).

6  According to Dr. Ehrenwerth, a "clinically significant" improvement "must...be useful in a wide

7  variety of circumstances that a clinician encounters on a routine basis."  *Id.*

8    Dr. Ehrenwerth also criticizes the purported benefits of the new sensors introduced by

9  Tyco, suggesting that if MaxFast were such an improvement "one would in fact expect clinicians

10 to enthusiastically embrace the technology."  *Id.* ¶11.  Plaintiffs emphasize the fact that only 367

11 customers (out of some 2,300 or more total OxiMax sensor customers) were purchasing the

12 touted MaxFast sensor, and introduced testimony that the product has had "several problems

13 with headbands, and so physicians were less interested in studying it until it…was a more

14 workable product."  Opper Decl., Exh. 47 (Scharf Depo. at 121:24-122:2).[27]  Plaintiffs dispute

15 the value of Tyco's SoftCare OxiMax sensor, which Tyco claims was "designed…to work

16 without the adhesive that would potentially damage the fragile skin of a neonate or an elderly

17 patient with fragile skin," Defs.' Stmt. of Undisp. Facts ¶122, because Tyco "fails to cite any

18 serious independent studies…regarding its benefits."  Pls.' Stmt. of Gen. Issues ¶122.  Plaintiffs

19 also argue that "Tyco has failed to establish why this sensor could not have been offered in an R-

20 Cal compatible format."  Pls.' Opp. at 18.

21    Plaintiffs' criticisms extend to each of the new features in OxiMax.  Dr. Ehrenwerth

22 explains that storing patient alarm events on the sensor is valueless because (1) that information

23 is alternately available on the patient's chart and monitor; (2) the feature is implemented only on

24

25

26

27 [27] Plaintiffs also argue that a clinician can make the MaxFast sensor available to his patients by bringing in a stand-alone monitor and Tyco did not, therefore, have to convert every single monitor in the hospital to OxiMax.  Hearing Tr. at 44:10-19.  This argument becomes unavailing in view of the Section III.B.3, *infra*, which essentially

28 concludes that Tyco did not "convert" anyone – hospitals converted themselves.  The Court will not penalize Tyco for hospitals' decisions to adopt more OxiMax monitors than necessary for their use of MaxFast.

-24-

1   the disposable sensor; and (3) it requires OxiMax monitors to read the data.  *See* Opper Decl.,

2   Exh. 8 (Ehrenwerth Rebuttal Decl. ¶14).

3        Similarly, Dr. Ehrenwerth criticizes the "sensor messaging" feature.  According to him,

4   "you have to be careful with these error messages.  The problem we have in the operating room

5   is we have a huge number of things going on.  We have a lot of alarm messages most of which

6   are not helpful and very distracting…So, yes, I don't consider that necessarily a benefit."  Pls.'

7   Stmt. of Gen. Issues ¶127 (citing Opper Decl., Exh. 48 (Ehrenwerth Depo. at 196:11-14)).

8   Additionally, Plaintiffs cite Dr. Scharf's opinion that "the most likely people to use that [feature]

9   would be a lower level newer user", because "the power users…are pretty much familiar with the

10  specific problem areas."  *Id.* (citing Opper Decl., Exh. 47 (Scharf Depo. at 80:5-13)).[28]

11  According to Plaintiffs, "[o]ne would…hope that after the many years since pulse oximetry has

12  become a 'standard of care,' that very little guesswork is involved in applying the sensor

13  correctly."  Pls.' Opp. at 17.

14

15                      iv.   Analysis

16       In considering Plaintiffs' criticisms of Tyco's design change, the Court is cognizant of

17  the possibility that a monopolist could introduce pretextual technological innovations – <u>patent</u>-

18  protected pretextual innovations[29] – to impede its competitors.  But the Court is also aware of the

19  effects on innovation that follow from post-hoc judicial scrutiny of a firm's technological design

20  choices.  *See* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶775c, 231 (2d ed.

21

22  [28] Plaintiffs' citation to the Scharf deposition in Pls.' Stmt. of Gen. Issues ¶127 does not appear to reference the

23  quoted text.  *See* Opper Decl., Exh. 47 (Scharf Depo. at 80:5-13).  The Court assumes that the Plaintiffs quote in ¶127 is accurate, but does not include an accurate cite to the deposition transcript.

   [29] This discussion assumes, once again, that the patents do not preclude the conclusion that the innovations are

24  valueless or pretextual.  *See* note 25, *supra* (citing the *Xerox* case and the absence of a bright line rule protecting a monopolist's introduction of a patented product design).  Some courts suggest bright line rules barring Section 2

25  liability for patented product innovations.  *See, e.g., C.R. Bard v. M3 Sys., Inc.*, 157 F.3d 1340, 1370 (Fed. Cir.

26  1998) (Newman, J., dissenting) ("It was not Bard's changes to its biopsy gun or needles that affected M3's sale of replacement needles; it was the patents on these products. To hold that Bard could violate the Sherman Act

27  by changing these products, if M3's business was adversely affected, is a novel and pernicious theory of antitrust law that is contrary to the principles of competition, and fraught with litigation-generating mischief."); *Walgreen*

28  *Co. v. AstraZeneca Pharm. L.P.*, 534 F. Supp. 2d 146, 151 (D.D.C. 2008) (citing Areeda & Hovenkamp for the principle that Section 2 antitrust remedies "should not be applied to monopolists who introduce new products under patents or, presumably, other official grants of exclusivity").

2002) ("Any judicial rule for condemning possibly anticompetitive innovation under the antitrust laws must be formulated so as not to discourage" true innovation).  Here, acceptance of Plaintiffs' criticisms of Tyco's design changes would clearly impose a standard unduly restrictive of product innovation.  Dr. Ehrenwerth, for example, opines that:

> [A] device or an improvement in a device such as a pulse oximeter might provide meaningful benefits (or clinically significant benefits) only if the improvements provide real clinical benefits to patients that are not available with reasonable alternatives.  Thus, in general, for an improvement to be clinically significant, such an "improvement" must also be useful in a variety of circumstances that a clinician encounters on a routine basis.  The medical device field is replete with instruments that had potential benefit, but the "benefit" never materialized.

Opper Decl., Exh. 8 (Ehrenwerth Rebuttal Decl. ¶¶4-5).

Certainly antitrust law cannot limit Tyco to solving only those problems for which clinicians have no "reasonable alternative," as Plaintiffs suggest through their heavy reliance on Dr. Ehrenwerth.[30]  More to the point, Plaintiffs cannot explain why antitrust law restricts Tyco's introduction of new products to those that are necessarily "useful in a wide variety of circumstances that a clinician encounters on a routine basis" rather than those that represent an overall superior competitive offering.  Inexplicably, in their reliance on Dr. Ehrenwerth to create disputed facts, Plaintiffs fail to contemplate the possibility that a product redesign can be competitively desirable even where it only improves function where the clinician is less experienced, *see, e.g.,* Opper Decl., Exh. 85 at 1161 (internal Tyco document from 2001 stating that sensor error diagnostics could benefit nurses, because they have had less oximetry training) or with specialized, but rare applications that warrant specialty sensors like MaxFast or SoftCare.[31]  Dr. Ehrenwerth's standard also excludes the possibility that the product redesign

---

[30] Not to belabor the point, but even if Dr. Ehrenwerth is correct that "[t]he medical device field is replete with instruments that had potential benefit, but the 'benefit' never materialized," Opper Decl., Exh. 8 (Ehrenwerth Rebuttal Decl. ¶¶4-5), imposing antitrust liability on firms for introducing those instruments, where they had legitimate justifications for doing so, can only stunt the firms' product development processes.  *See* AREEDA & HOVENKAMP, ¶776d, 264.

[31] Plaintiffs show that the new OxiMax specialty sensors (SoftCare and MaxFast) represent a small (0.29%) portion of Tyco's OxiMax sales since January 2002.  *See* Pls.' Summary Judgment Hearing Documents, Exh. 20 ("MaxFast and SoftCare Sensor Sales").  *See also* Opper Decl., Exh. 1 Table B1.  Plaintiffs infer that the limited sales of the products reflects the "little, if any, clinical innovation" represented by the OxiMax platform. Pls.' Opp. at 18.  Tyco

-26-

1   offers benefits to hospitals – "customers" in this case – even without being "clinically

2   significant."  For example, a monopolist could provide a superior competitive offering simply by

3   lowering manufacturing cost and price, without otherwise improving the clinical performance of

4   the products.  *See CalComp*, 613 F.2d at 742.  Alternatively, as here, it may do so through

5   technological innovation that simplifies and encourages the distribution of new types of sensors

6   by removing the need to modify the less flexible monitor equipment when new sensors are

7   developed.

8          The same principle holds true with respect to Plaintiffs' responses to the "sensor event

9   monitoring" feature.  The feature is an improvement because data about the patient's pulse

10  oximetry history is contained on the sensor, which may move with the patient, regardless of

11  whether the information is alternately available on the chart or the monitor.

12         Similarly, regardless of the needs of pulse oximetry power users, *see* Pls.' Opp. at 17,

13  "sensor messaging" purports to benefit lower level users in diagnosing measurement errors.  *See,*

14  *e.g.,* Opper Decl., Exh. 85 at 1161 (Tyco document stating that, while some doctors found little

15  value in the sensor messaging, "[n]urses could benefit, as they have had less oximetry training").

16         In other words, Tyco has every right to design and promote features that appeal to some

17  customers even if the design may not comport with some clinicians' protocols for viewing

18  patient data or their views on the effectiveness of specialty sensors.  The Court must conclude

19  that Tyco's OxiMax technology – its sensors, coupled with the changes in its monitors –

20  represented a superior and more sophisticated offering than the previous generation R-Cal

21  system.

22

23

24

25

26   offers the persuasive response that those customers that did purchase the 230,000 or so specialty sensors did so
     entirely out of their own free choice.  In other words, in disputing the value of MaxFast and SoftCare, Plaintiffs have
27   not suggested that any hospital was compelled to purchase these sensors over an alternative (or, indeed, that any
     alternative exists).  Thus, the purchases reflect the appeal of the specialty sensors.  *See, e.g., Abbott Labs. v. Teva*
28   *Pharms. USA, Inc.*, 432 F. Supp. 2d 408, 421 (D. Del. 2006) (explaining that where consumers choose to purchase a
     product, a court should not second guess the products' value).

2.   **Incompatibility with R-Cal**

The Court next addresses the principal drawback alleged with respect to Tyco's product redesign: Tyco discontinued its R-Cal monitors and designed OxiMax to be incompatible with generic R-Cal sensors.[32]   As the Court repeatedly emphasized at the hearing and Plaintiffs' counsel eventually conceded, the failure of Tyco to support R-Cal is the central objection to Tyco's conduct.[33]   Specifically, OxiMax monitors do not contain the technology to read an R-Cal sensor's resistor and select the appropriate calibration coefficients from the monitor's lookup table.   *See* Mannheimer Supp. Decl. ¶5.   It is not clear whether the monitors have a table at all. Instead, OxiMax monitors utilize a digital memory reader to read the contents of the digital memory chip on OxiMax sensors to determine the relevant coefficients.   *Id.*

The Court cannot and will not assess how difficult it would be for Tyco to incorporate both a digital memory reader and resistor reader in its OxiMax monitors to ensure backwards-compatibility with R-Cal and thus provide a design that is less restrictive of generic competition. *Image Technical Serv., Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 620 (9th Cir. 1990), *aff'd* 504 U.S. 451 (1992) (stating that "there is no least restrictive alternative requirement in the context of a Section 2 claim").   *See also In re IBM*, 481 F. Supp. at 1021 (stating that it would be a "novel theory with serious and far reaching anticompetitive effects" if a monopolist could not alter the design of a product "if any alternative was open to them which would have less impact on competitors").   Nor will the Court assess Tyco's failure to provide an adapter to ensure compatibility with R-Cal sensors or R-Cal versions of its specialty sensors.   *See* Pls.' Opp. at 18 ("Tyco has failed to establish why [SoftCare sensors] could not have been offered in an R-Cal compatible format.").

---

[32] Tyco contends that R-Cal-compatible monitors were available long after the R-Cal patent expired.  *See* Defs.' Mem. at 10.  Plaintiffs argue that regardless of whether Tyco was actually selling any R-Cal monitors, it had effectively discontinued the technology when it indicated to the market an intent to obsolete the R-Cal monitors in favor of OxiMax.  *See* Pls.' Stmt. of Gen. Issues ¶129.  The Court assumes, for purposes of this motion, that whatever Tyco did was effectively equivalent to discontinuing all production and support for R-Cal monitors.

[33] *See* Hearing Tr. at 30:3-24 (agreeing that "it is the change in the…monitor that creates the lock-out of generic manufacturers").

-28-

1     Crucially, Tyco, as a monopolist in pulse oximetry sensors, owes no affirmative duty to

2    produce and sell R-Cal-compatible monitors in order to support the market for its own or generic

3    R-Cal sensors.[34]  *See CalComp*, 613 F.2d at 744 (stating that IBM had "no duty to help CalComp

4    or other peripheral equipment manufacturers survive or expand" and it need not "have

5    constricted its product development so as to facilitate sales of rival products"); *Foremost*, 703

6    F.2d at 545 ("The antitrust laws did not impose a duty on Kodak to assist Foremost, other

7    photofinishers, or manufacturers of competing cameras, film, paper or chemicals to survive or

8    expand.") (citing *CalComp*).

9     The Ninth Circuit's commentary in *CalComp* and *Foremost* is particularly apposite here,

10    where Tyco, even as a monopolist, is and was subject to competitive forces.  Masimo was

11    making inroads on Tyco's installations of pulse oximetry monitors, providing direct competition

12    with Tyco's R-Cal with its own proprietary Signal Extraction Techology ("SET") monitors.

13    Masimo's CEO explains that the company has over 200,000 monitors installed in the United

14    States, and estimates Masimo sells roughly 40-45% of new pulse oximetry monitors sold in the

15    country.  Duss. Decl., Exh 21 (Kiani Depo. at 307-308); Defs.' Stmt. of Undisp. Facts ¶60.

16    Indeed, Plaintiffs tout the innovation and superiority of Masimo's SET over Tyco's R-Cal

17    products.  Compl. ¶¶59-61.  Additionally, at least three of the six Plaintiffs in this case had both

18    Masimo and Tyco monitors, and one former Plaintiff converted all of its monitors to Masimo

19    products.  *See* Section III.B.3, *infra*.

20     R-Cal-compatible monitors, meanwhile, could be produced by any company following

21    the expiration of the R-Cal patents[35] on November 11, 2003.  Defs.' Stmt. of Undisp. Facts ¶139.

22

23

24

25

26

---

[34] In some sense, Tyco's decision to obsolete R-Cal compatible technology is "business conduct" subject to *Oahu Gas* and its progeny.  *See Oahu Gas*, 838 F.2d at 368 ("Where a monopolist's refusal to aid a competitor is based partially on a desire to restrict competition, we determine antitrust liability by asking whether there was a legitimate business justification for the monopolist's conduct.").  The conclusion here is equivalent to a finding that Tyco's decision to obsolete R-Cal technology is not subject to Section 2 liability because it is supported by the legitimate business justification that the company was moving to a newer, more sophisticated product design.

27

28

[35] Tyco contends that the patents covering this technology have expired.  *See* Defs.' Stmt. of Undisp. Facts ¶139. Plaintiffs have not raised a genuine issue merely by responding that the patent expiration is "speculative."  Pls.' Stmt. of Gen. Issues ¶139.  They have not introduced or suggested any other patents that could prevent a company from manufacturing monitors with R-Cal technology.  Moreover, Plaintiffs later state that "Tyco's R-Cal patents expired in November, 2003."  Pls. Disp. Facts ¶5.

1   The emergence of Masimo's competitive products and the entry of the R-Cal technology into the

2   public domain presents a strong case that Tyco be allowed to make product development

3   decisions in the feature-set of a new platform to distinguish itself in both monitors and sensors,

4   even if doing so created incompatibility with previous generation technology and ultimately

5   resulted in mixed reviews from the industry.  Here, that feature-set was not possible with existing

6   monitors, and thus necessitated a change in the monitor design.  *See* Opper Decl., Exh 18 (Mann.

7   Depo. at 91:12-13) (stating that an R-Cal monitor would not work with the digital chip in

8   OxiMax).  As the Court has already concluded that the feature-set represents a legitimate

9   improvement over R-Cal, antitrust law should not confine Tyco to supporting public domain R-

10  Cal technology indefinitely – thereby "constrict[ing] its product development," *CalComp*, 613

11  F.2d at 744 – to provide a platform for generic sensors.

12

13              **3.  Coercive or Unreasonable Propagation of OxiMax Technology**

14              The Court now turns to whether Tyco is entitled to summary judgment that its conduct in

15  propagating the OxiMax technology does not violate Section 2.  It observes that the inquiry must

16  focus on the propagation of OxiMax monitors because a hospital can only be "locked in" to

17  purchasing OxiMax sensors if it has adopted OxiMax monitors.  Plaintiffs' allegations, including

18  those concerning Tyco's contracts, are subject to a standard evaluating whether Tyco's conduct

19  was unreasonably restrictive of competition.  *See CalComp*, 613 F.2d at 735-736 ("The

20  defendant's acts are properly analyzed analogously to contracts, combinations, and conspiracies

21  under §1 of the Sherman Act: the test is whether the defendant's acts, otherwise lawful, were

22  [u]nreasonably restrictive of competition.").

23              Tyco contends that it did not "require any customers to adopt OxiMax technology."

24  Defs.' Stmt. of Undisp. Facts ¶133.  Plaintiffs respond that Tyco's contention is incomplete for

25  several reasons: (1) Tyco discontinued its R-Cal monitors; (2) Tyco leveraged its contracts with

26  GPOs and utilized equipment financing programs to convert customers to OxiMax; (3) Tyco

27  "relied on standardization to achieve a quicker OxiMax conversion"; and (4) Tyco provided

28  incentives for OEMs to adopt OxiMax technology.  *See* Pls.' Stmt. of Gen. Issues ¶¶133, 137-

138.  Plaintiffs thus allege that several separate aspects of Tyco's conduct worked collectively to unreasonably restrain generic competition even if Tyco did not require its customers to adopt OxiMax.[36]

This allegation describes the "synergistic effect" that potentially arises from multiple individual acts.  *See, e.g., City of Anaheim v. Southern Cal. Edison Co.*, 955 F.2d 1373, 1378 (9th Cir. 1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect."); *CalComp*, 613 F.2d at 746 (considering the various acts of IBM collectively, but finding no synergistic effect).

This Court addressed the necessity to evaluate the overall combined effects of Tyco's conduct in the context of the *Masimo* competitor suit.  *See Masimo Corp. v. Tyco Health Care Group, L.P.,* 2004 U.S. Dist. LEXIS 26916, at *16 (C.D. Cal. June 9, 2004).  As in that case, Plaintiffs "throw[] into the 'mix' every potential allegation…without regard as to whether such conduct is truly anticompetitive."  *Id.*  For example, Plaintiffs' argument that Tyco's reliance on sensor standardization facilitated the OxiMax conversion is misplaced.  Plaintiffs may be correct that a hospital with some OxiMax monitors and some R-Cal monitors typically prefers to purchase exclusively OxiMax sensors to standardize their sensor purchases.  *See, e.g.,* Pls.' Stmt. of Gen. Issues ¶133; Opper Decl., Exh 23 (Earp. Depo. at 228:8-229:2).  Such a preference says very little about why OxiMax monitors penetrated the marketplace in the first instance.  In other words, the relevant question is why hospitals upgraded to OxiMax monitors from Tyco's R-Cal monitors.  Plaintiffs' assessment of sensor standardization, even if true, does not answer that question.

Other components of Tyco's conduct are not challenged as independent violations of the Sherman Act and are hardly, if at all, mentioned in Plaintiffs' Second Amended Complaint.  The

---

[36] Plaintiffs have repeated this view several times.  *See, e.g.*, Pls.' Opp. at 8 (describing the components of the "OxiMax strategy"); *id.*at 24 ("[E]ven if Tyco's sole-source and market-share contracts are not found to be independently unlawful…their impact in conjunction with Tyco's conduct taken as a whole must be considered"); Hearing Tr. at 46:14-23; *id.*at 51:11-18 ("We're also saying…that even if a jury finds that the use of that type of program was not in and of itself a discrete antitrust violation, to the extent that practice permitted Tyco to convery the market away from R-Cal monitors to the OxiMax monitors, that supports a finding by the jury that the OxiMax conversion strategy as planned and implemented was anticompetitive.").

1   Court previously addressed equipment financing programs – even though they are not mentioned

2   in the Complaint – and commented on the lack of coercion inherent in those programs.  *See*

3   Section III.A.1, *supra*.  *See also Masimo,* 2006 U.S. Dist. LEXIS 29977, at *4 ("The jury

4   concluded that Tyco's Equipment Finance Programs were lawful.").  Similarly, Plaintiffs appear

5   to concede that OxiMax-related agreements between Tyco and OEMs GE and Philips do not

6   independently violate the antitrust laws.  *See* Hearing Tr. at 54:23-25.  Notably, the agreements

7   do not prohibit Philips or GE from selling R-Cal-compatible monitors.  Defs.' Stmt. of Undisp.

8   Facts ¶¶137-138.

9        Finally, market-share and sole-source agreements and Tyco's discontinuation of OxiMax

10   – conduct that Plaintiffs challenge as discrete violations – were deemed lawful under Sections 1

11   and 2.  The Court is thus confronted with a scenario where no single aspect of the allegedly

12   anticompetitive behavior violates Section 1 or Section 2.  In such a scenario, "it becomes much

13   more difficult to find overall wrongdoing."  *City of Anaheim*, 955 F.2d at 1376.

14        Certainly relevant here are excerpts from Tyco documents[37] suggesting that Tyco acted

15   with predatory intent in propagating the OxiMax platform before the R-Cal patent expired in

16   order to protect their position.  *See, e.g.,* Opper Decl., Exh. 82 at 1113 (2000 Tyco planning

17   document advocating the creation of a "new installed base of proprietary sockets and sensors

18   prior to 2003"); Opper Decl., Exh 56 at 839 (Tyco document stating that new monitors need not

19   be compatible to old sensors and generics will be "locked out" of new systems); Opper Decl.,

20   Exh. 110 at 1631 (1998 document noting that "time [is] running out to erect a better barrier vs.

21   generics by 2003"); Opper Decl., Exh. 91 at 1316 (email between Tyco employees expressing a

22   fear that OxiMax could be perceived by the media as a "near lockout whose success is based on

23   GPO control").

24        The posture of this motion does not prevent the Court from viewing Tyco's statements in

25   context.  The very same documents impart Tyco's concern for innovation and aggressive

26

27   ────────────────

28   [37] The Court notes that Plaintiffs repeatedly excerpt from documents without providing any sense of context.
Plaintiffs' citations rarely include when the document was written and whether it actually concerns OxiMax as
currently on the market or predecessor technology (such as "CoolBrite").

1    competition on the merits. *See, e.g.,* Opper Decl., Exh. 82 at 1110 (describing its "Socket

2    Strategy" as driving "market adoption of next-generation technology through aggressive

3    promotion of premium performance Nellcor-brand standalone monitors" and defending the

4    "OEM/Licensee base with state-of-the-art technology at the lowest possible cost"); *id.* at 1111

5    (stating that its "Sensor Strategy" is to "[d]evelop and promote the best performing, broadest line

6    of adhesives and reusables"); Opper Decl., Exh. 55 at 808 ( 2000 "OxiMax Strategy Overview"

7    document stating that Tyco should "[u]se product features to differentiate its sensors from

8    generics" and "[c]reate a new, flexible platform for future oximetry innovation"); *id.* at 816

9    (characterizing the OxiMax strategy as "offer[ing] new proprietary oximetry value with customer

10   value); Opper Decl., Exh. 110 at 1631 (stating that the ideal goal is that "[n]ew patentable

11   technology adds such value that it induces a compelling need to buy" and "[t]hus customers

12   would readily convert regardless of switching costs and forego the opportunity to buy lower cost

13   generics"); Opper Decl., Exh. 91 at 1316 (email message describing the importance of

14   substantive promotion of MaxFast as a significant, innovative feature). *See also* Duss. Decl.,

15   Exh. 114 at 2644 (Tyco OxiMax document describing that Tyco "has sought to break free from

16   previous design constraints of conventional, 'in-the-box' calibration to create a pulse oximetry

17   platform that can keep pace with evolving clinical demands"); *id.* at 2647 (explaining that

18   OxiMax was desirable because R-Cal's pre-programmed calibration coefficients limit Tyco's

19   ability to take advantage of newer high-efficiency LEDs).

20        At most, these documents establish that Tyco acted with mixed motives in introducing

21   the OxiMax platform, with predatory intent towards generic competitors as one of those motives.

22   That conclusion, even coupled with the collective force of the allegations, cannot cure the utter

23   lack of proof demonstrating the synergistic effects of Tyco's behavior. *See Northeastern Tel.*

24   *Co. v. Am. Tel. & Tel. Co.*, 651 F.2d 76, 95 n.28 (2d Cir. 1981) ("We have found…that in

25   numerous critical respects Northeastern's proof was utterly lacking. Under such circumstances,

26   treating Northeastern's claims collectively cannot have any synergistic effect."). In particular,

27   Plaintiffs have made these allegations in complete ignorance of their own history with Tyco's

28   OxiMax platform. Plaintiffs' stories overwhelmingly support the conclusion that Tyco did

nothing to force OxiMax monitors on its customers, and beyond that, did nothing unreasonably

restrictive in selling them:

> • Three of the six Plaintiffs (Allied, Natchitoches, and North Bay) had not heard of
> OxiMax prior to this litigation. Defs.' Stmt. of Undisp. Facts ¶¶202, 214.  At
> deposition, an Allied representative testified that it has unfettered choice of monitors,
> that it has never bought an OxiMax monitor, and that it has bought a Masimo monitor.
> *Id.* ¶¶160-170.

> • South Jersey has a fleet of monitors composed of thirteen Masimo monitors and nine
> Tyco monitors, and chose to upgrade its nine Tyco monitors to OxiMax because it
> believed (correctly or not) that the upgrade would provide benefits in certain clinical
> specialty areas.  Duss. Decl., Exh. 35 (Samchuck Depo. at 565:3-22) ("Well, I believe
> the reason we got involved with the OxiMax product was that it would improve clinical
> efficacy on neonatal and pediatric patients.").

> • Brooks also has had both Tyco and Masimo monitors on hand since 2003, and it cited
> Tyco's bundling program (which is not challenged in this case) as affecting its
> purchasing decisions.  *Id.* ¶¶170, 174.  The hospital did not participate in Tyco's
> equipment financing programs because it believed participation would ultimately be
> more expensive than purchasing the equipment outright or borrowing money from
> another source.  *Id.* ¶177; Duss. Decl., Exh. 19 (Ketcham Depo. at 8:17-21).

> • DHLC, though citing a market-share agreement as limiting its "choice", freely admits
> that it has not evaluated other products from other manufacturers because it believes
> that the Tyco's pulse oximeters, sensors, cables and equipment were quality products
> that met its clinical needs.  Duss. Decl., Exh. 25 (Manni Depo. at 33:2-21).
> Additionally, DHLC chose to upgrade some of their older Tyco monitors to OxiMax
> after evaluating its technological benefits.  Duss. Decl., Exh. 26 (Manni Depo. at
> 451:17-453:8).

> • Finally, Abington had generally been satisfied with Tyco's pulse oximetry products
> and admits that it could purchase pulse oximetry products from Masimo.  Duss. Decl.,
> Exh. 16 (Galati Depo. at 232:10-16, 237:31-238:6).  Abington upgraded to OxiMax
> because it "assumed that since [Tyco] came out with something else that it was better
> than the previous product."  Opper Decl., Exh. 31 (Galati Depo. at 174:17-22).  Of
> course, Abington ultimately converted all of its monitors to Masimo in January, 2008.
> Defs.' Stmt. of Undisp. Facts ¶159.

No reasonable jury in viewing the statements of these parties – including those

concerning their adoption of Masimo monitors and their perceptions about OxiMax – would

conclude that Tyco's OxiMax-related conduct interfered with their choice of pulse oximetry

1   monitors (and thus the OxiMax sensors that may have followed those monitors).  *Cf. Abbott*

2   *Labs. v. Teva Pharms. USA, Inc.*, 432 F. Supp. 2d 408, 421 (D. Del. 2006) (explaining that if

3   consumers freely choose to buy a new product, their choice reflects the value of that product

4   over competing products, and in that sense the innovation is best viewed as inflicting a lawful

5   and natural harm on competitors); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 287

6   (2d Cir. 1979) ("If a monopolist's products gain acceptance in the market...it is of no importance

7   that a judge or jury may later regard them as inferior, so long as that success was not based on

8   any form of coercion.").

9          Plaintiffs theorize that they were harmed regardless of their own views of OxiMax or

10  their brand loyalty to Tyco because the "OxiMax strategy" allegedly suppressed generics and

11  allowed Tyco to inflate its prices.[38]  However, there is essentially nothing on this record to

12  suggest that other customers acted differently than these Plaintiffs.[39]

13

14

15

16

17

18

19

20

21

22

23

24

25

---

26  [38] *See, e.g.,* Hearing Tr. at 31:11-20 (commenting that regardless of what Plaintiffs did "even the most brand loyal
27  consumer would be entitled to the benefits of price competition if market-wide the effect of Tyco's exclusion of
    generic sensor manufacturers was to enable them to keep their R-Cal sensor prices higher than they would have been
    but for their anticompetitive conduct").
28  [39] In view of this conclusion, the Court declines to address Tyco's arguments that Plaintiffs cannot show impact or
    damages.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV.

### CONCLUSION

For the foregoing reasons, the Court grants Tyco's motion for summary judgment with respect to Plaintiffs' claims under Sections 1 and 2 of the Sherman Act. This order concludes the proceedings in this Court on the merits of Plaintiffs' antitrust claims. Before final judgment is entered, the parties shall advise the Court whether any further proceedings are necessary. The Court directs them to do so by July 18, 2008.


IT IS SO ORDERED.


DATED: July 09, 2008

_Mariana R. Pfaelzer_
Hon. Mariana R. Pfaelzer
United States District Judge