```
 1                 UNITED STATES DISTRICT COURT

 2         CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3         HONORABLE MARIANA R. PFAELZER, U.S. DISTRICT JUDGE

 4                              - - -

 5

 6

 7                                          )
     ALLIED ORTHOPEDIC APPLIANCES,           )
 8   INC.,                                   )
                                             )
 9                     PLAINTIFF,            )
                                             )
10         vs.                               ) No. CV05-6419-MRP(AJWx)
                                             )
11   TYCO HEALTH CARE GROUP, L.P.,           )
     ET AL.,                                 )
12                                           )
                       DEFENDANTS.           )
13   _____)

14

15        REPORTER'S TRANSCRIPT OF TELEPHONIC PROCEEDINGS

16                       HELD IN CHAMBERS

17                    LOS ANGELES, CALIFORNIA

18                   WEDNESDAY, JUNE 4, 2008

19

20

21

22          _____

23              CINDY L. NIRENBERG, CSR 5059
                U.S. Official Court Reporter
24              312 North Spring Street, #438
                Los Angeles, California 90012
25                 www.cindynirenberg.com
```

```
 1  APPEARANCES OF COUNSEL:

 2

 3  FOR THE PLAINTIFF (TELEPHONICALLY):

 4                  GARWIN GERSTEIN & FISHER
                    BY: JOSEPH OPPER, ATTORNEY AT LAW
 5                      ANNA TYDIOUK, ATTORNEY AT LAW
                    1501 BROADWAY
 6                  SUITE 1416
                    NEW YORK, NY 10036
 7                  212-398-0055

 8                  COHEN MILSTEIN HAUSFELD & TOLL
                    BY: BRENT W. LANDAU, ATTORNEY AT LAW
 9                  255 SOUTH 17TH STREET
                    SUITE 1307
10                  PHILADELPHIA, PA 19103
                    267-773-4684
11

12

13  FOR THE DEFENDANTS (TELEPHONICALLY):

14                  GIBSON DUNN & CRUTCHER
                    BY: CHRISTOPHER DUSSEAULT, ATTORNEY AT LAW
15                      CAROL M. SILBERBERG, ATTORNEY AT LAW
                        HEATHER L. RICHARDSON, ATTORNEY AT LAW
16                      SCOTT EDELMAN, ATTORNEY AT LAW
                        SOGAL PIRNAZAR, ATTORNEY AT LAW
17                  333 SOUTH GRAND AVENUE
                    45TH FLOOR
18                  LOS ANGELES, CA 90071
                    213-229-7000
19

20

21

22

23

24

25
```

```
 1            LOS ANGELES, CALIFORNIA; WEDNESDAY, JUNE 4, 2008
 2                             1:04 P.M.
 3                             - - - - -
 4        (The following was held telephonically in chambers.)
 5            THE CLERK:  Good morning, Counsel.
 6            In the matter of the lead case, case number
 7   CV05-6419, Allied Orthopedic Appliances, Inc. versus Tyco
 8   Healthcare Group.
 9            Counsel, please state your appearances for the
10   record.
11            MR. OPPER:  Joseph Opper, Garwin Gerstein & Fisher,
12   for the plaintiffs and joined by Anna Tydiouk from my office.
13            MR. LANDAU:  Good afternoon, Your Honor.  This is
14   Brent Landau from Cohen Milstein Hausfeld & Toll also for the
15   plaintiffs.
16            MR. DUSSEAULT:  Good afternoon, Your Honor.  Chris
17   Dusseault from Gibson Dunn & Crutcher on behalf of the
18   defendants.  And I'm joined today by a number of lawyers from
19   our firm:  Scott Edelman, Sogal Pirnazar, Carol Silberberg and
20   Heather Richardson.
21            THE COURT:  I called you because we're working -- as
22   you send the material in, we're working on the motion for
23   summary judgment, and we're working also on the -- well,
24   there's now a motion regarding one of the experts, but we're
25   being hung up by one factual question, and it keeps coming up,
```

```
 1   and I would like to just air it with both of you and have you
 2   answer it, and then we'll just stop worrying about it.
 3            Variously in the papers, you refer to the OxiMax
 4   system, the OxiMax technology.  You refer to sometimes the
 5   proprietary OxiMax material and technology.  Sometimes you
 6   refer to it as the patented protected technology.  And since
 7   we've got this -- now I'm being as straightforward as I can be.
 8   Since we've got one part of the problem that deals with
 9   balancing or deals with justification, however you look at the
10   law, we are at the point where since it comes up so often, I
11   want you to tell me where and how a patent is involved in this.
12            MR. DUSSEAULT:  Your Honor, this is Chris Dusseault.
13   Would you like me to address that?
14            THE COURT:  Well, you can do it or the other side can
15   do it, but -- usually it's in the other side's papers, but it
16   certainly was in yours because you explained the changes that
17   had been made.
18            MR. DUSSEAULT:  Certainly.  I am certainly happy to
19   let plaintiffs address it if they are the ones who raised it
20   most in their papers.
21            THE COURT:  No.  No, you raise it --
22            MR. DUSSEAULT:  Okay.
23            THE COURT:  -- at the beginning.  But they raise it
24   more often than you do, but you explained it in the beginning.
25   But neither of you have told me if there is actually a patent
```

1  involved.
2       MR. DUSSEAULT:  Your Honor, my understanding is that
3  the OxiMax system, including the OxiMax monitors and the OxiMax
4  sensors that include a digital memory chip in the sensors, are
5  patented technology.
6       THE COURT:  And are they patented separately?  If
7  they are patented separately, who holds the patents?
8       MR. DUSSEAULT:  My understanding, Your Honor, is that
9  Tyco holds the patents.  And I believe that there are separate
10 patents, but I would want to verify that.
11      It is -- as with the R-Cal patents, there is often
12 discussion of, you know, the R-Cal patents or OxiMax patents.
13 I believe there are separate patents that would pertain to
14 sensors and monitors, but I'd want to double-check that to be
15 sure I'm correct.
16      I believe, though, it's undisputed that there are
17 patents that apply to it.
18      THE COURT:  If there are patents that apply to it, I
19 would like to know what they are and what they cover.
20      MR. DUSSEAULT:  Okay.
21      THE COURT:  Now, then, I want the plaintiffs to tell
22 me what are you referring to.
23      MR. OPPER:  Your Honor, my understanding is
24 consistent with Mr. Dusseault's that there are patents that
25 apply to Tyco's OxiMax technology that we sometimes refer to as

```
 1   proprietary technology.  I do not know at this time the
 2   specific patent numbers.
 3           THE COURT:  Now, wait.  Wait.  Wait.  Your only
 4   information about whether there are patents or not comes from
 5   Mr. Dusseault?
 6           MR. OPPER:  Well, Your Honor, I don't believe it's
 7   been disputed that the OxiMax technology is patented by Tyco.
 8           THE COURT:  Well, that's not going to help the Court
 9   any.  The fact that you don't dispute it -- I want to know what
10   patents, and I want to know what it covers, and I want to know
11   who owns the patents.
12           MR. DUSSEAULT:  Your Honor, this is Chris Dusseault.
13   We could certainly provide that in specificity for the Court.
14           THE COURT:  All right.  Now, then, the next part of
15   it is do they cover a monitor or a monitor and the sensor or do
16   they cover a system?
17           MR. DUSSEAULT:  Your Honor, Chris Dusseault again.  I
18   would like to do some further digging to make sure that I state
19   this correctly, but my understanding is that there are likely
20   patents that address both a -- there is likely to be a patent
21   that addresses the monitor, a patent that addresses the sensor,
22   and a patent that addresses the interconnection of the two.
23           THE COURT:  Ah, you mean a cable?
24           MR. DUSSEAULT:  No, actually, Your Honor, I wasn't
25   meaning that.  I meant how the two work together.
```

```
 1              THE COURT:  Oh, I see.
 2              MR. DUSSEAULT:  Yes.
 3              THE COURT:  All right.  Now, what do you say about
 4    that, Mr. Opper?
 5              MR. OPPER:  Your Honor, again, that is consistent
 6    with plaintiffs' understanding, and it's also been my
 7    understanding that it's not a disputed issue with respect to
 8    the motion.
 9              THE COURT:  So from the time that the fifth change,
10    that is, the fifth version of -- fifth generation version of
11    the monitor and sensor were introduced, it was covered -- that
12    fifth generation was covered by either one or more patents; is
13    that right?
14              MR. DUSSEAULT:  Yes, Your Honor.
15              THE COURT:  And are those patents still in effect?
16    They are still running, the term of the patents?
17              MR. DUSSEAULT:  Yes, Your Honor.
18              THE COURT:  Now, the next part is when did -- the
19    next factual question is when did the FDA permit generics to go
20    on the market?
21              MR. DUSSEAULT:  Your Honor, I'm sorry.  We're trying
22    to confer here as a team.
23              I know -- yeah.  As I say, we are trying -- this is,
24    I think, referenced in our papers, and we're just trying to
25    make sure we give you the right information.
```

```
 1            I believe that answer is different for different
 2   manufacturers based on when they did their filing.
 3            They were allowed to enter, in terms of patent
 4   expiration, in November of 2003, and different generic sensor
 5   manufacturers sought and received FDA approval at different
 6   times, and we tried to set forth that specific information in
 7   our separate Statement of Undisputed Facts.
 8            THE COURT:  Do you think that each one of the -- just
 9   so that I'm sure about this.  If I go to the Statement of
10   Facts, I will find out when Masimo was authorized by the FDA or
11   Olimex was?
12            MR. DUSSEAULT:  Yes, Your Honor.  And, for example,
13   Undisputed Fact Number 88 --
14            THE COURT:  All right.
15            MR. DUSSEAULT:  -- in our submission states that on
16   December 12 of 2003, Masimo received FDA approval to market its
17   SPO2.com generic sensor.
18            THE COURT:  Ah.  All right.  Now, will you both make
19   a separate one-page submission telling me the answer to the
20   first set of questions I put to you which is that having to do
21   with the patented-protected technology and what it covered?
22            MR. DUSSEAULT:  We would be delighted to do that,
23   Your Honor.
24            THE COURT:  All right.  Now, I take it that in
25   weighing and balancing or finding a justification, when I'm
```

```
 1   looking at the material on whether there's an improvement in a
 2   sensor, what you are saying is that I should only be looking at
 3   the sensors and not the monitors?
 4           MR. DUSSEAULT:  No, Your Honor.  That's certainly not
 5   our position.
 6           Our position is that the OxiMax system was developed
 7   and released as a system that includes monitors and sensors,
 8   and that what you ought to be looking at is whether there is an
 9   improvement in that system that we offered.
10           As I understand plaintiffs' argument, it's that we
11   somehow violated the antitrust laws by developing that system
12   at all.
13           So we certainly look at -- because one of the primary
14   innovations of OxiMax was to put a chip in the sensor, many of
15   the benefits come from greater sensor flexibility and designs
16   that are offered through the sensors and features in the
17   sensors, but we certainly view that as a justification for the
18   development of OxiMax' system as a whole.
19           THE COURT:  All right.  Mr. Opper?
20           MR. OPPER:  Well, Your Honor, we obviously have
21   disputed the significance of the innovation or product
22   improvement, if any, with respect to OxiMax.
23           To the extent there is a benefit to end users in
24   commissions and/or patients, it would be approved, you know,
25   any additional (unintelligible) that the sensor would provide.
```

```
 1              THE COURT:  Tell me that again, Mr. Opper.
 2              MR. OPPER:  We have disputed whether there have been
 3   any technological improvements through the OxiMax technology,
 4   but in order for there to be any real appreciable benefits,
 5   they would have to be, you know, attributable to the end users
 6   which would be either the clinicians or the patients, you know,
 7   who have the benefit of the new sensor -- I mean, assuming it
 8   has some value.
 9              I apologize if I am being somewhat unclear, but for
10   there to be any benefit from the new OxiMax technology, it
11   would have to be evident through something additional that the
12   sensor provides.
13              THE COURT:  Well, the purpose of the platform, or
14   whatever words you use for it, is to put some of the changes in
15   the sensor, but a lot depends on whether you're looking at the
16   whole, because the real change that you're complaining about is
17   in the monitor.  You can't work a generic sensor with this
18   monitor, can you?
19              MR. OPPER:  That's correct.  That's correct, Your
20   Honor.  And so --
21              THE COURT:  But it's the monitor, then?
22              MR. OPPER:  Well, it's the monitor that controls the
23   use of the sensor.
24              And Tyco has said, you know, through their new and
25   so-called improved sensor, they are able to offer improvements
```

```
 1   to clinicians, and that's what we dispute.
 2           But it's my understanding that -- and what we allege,
 3   as the Court alluded to -- that the anti-competitive impact of
 4   the OxiMax system is that in order to get the benefit of the
 5   OxiMax sensor, you need to have an OxiMax monitor to plug the
 6   sensor into, and that that is patent protected.
 7           THE COURT:  I want you both to make a submission not
 8   on the benefits of it, but I want you to tell me when you are
 9   referring to the OxiMax technology, what you are referring to,
10   the patented technology, what patents are involved from your
11   standpoint.
12           I want you to agree to that, if you can.  I want to
13   know the numbers of the patents and what they cover.
14           MR. DUSSEAULT:  That would be fine, Your Honor.  We
15   can do that.
16           THE COURT:  All right.  Thank you.  And I'd like to
17   have that by Monday.
18           MR. OPPER:  Okay.  Your Honor, you're anticipating a
19   joint submission to the extent we can agree?
20           THE COURT:  Well, if you can.  And if you can't, then
21   just send in whatever you want separately.  This is a very
22   simple request.
23           MR. DUSSEAULT:  I think we understand, Your Honor.
24   That makes sense.  We'll certainly try and coordinate it.
25           THE COURT:  Look, if the patent covers the sensor,
```

1  that I want to know.  If the patent covers a system, I'm
2  interested in that.  If the patent covers only the monitor or a
3  portion of the monitor, I'm interested in that.
4          MR. DUSSEAULT:  Okay.  We'll certainly address that.
5          THE COURT:  Thank you.
6          MR. DUSSEAULT:  Thank you, Your Honor.
7          MR. OPPER:  Thank you, Your Honor.
8      (Proceedings concluded.)
9                        --oOo--